# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WASHINGTON D.C.

| | |
|---|---|
| Stephen Thaler, an individual, 1767 Waterfall Dr., St. Charles, MO 63303,<br><br>*Plaintiff*,<br><br>v.<br><br>Shira Perlmutter, in her official capacity as Register of Copyrights and Director of the United States Copyright Office; and The United States Copyright Office, 101 Independence Ave., S.E., Washington, D.C. 20559-6000,<br><br>*Defendants*. | Case No. : 1:22-cv-01564<br><br>**COMPLAINT** |

Plaintiff Stephen Thaler ("Dr. Thaler") complains and alleges against Defendant Shira Perlmutter (the "Register"), in her official capacity as the Register of Copyrights and Director of the United States Copyright Office, and Defendant the United States Copyright Office ("USCO," and together with Register, the "Defendants") as follows:

## NATURE OF ACTION

1. Dr. Thaler is in the business of developing and applying advanced artificial intelligence (AI) systems capable of generating creative output that would historically qualify for copyright protection and that are made under conditions in which no natural person contributed to the work as a traditional author ("AI-Generated Works").

1

2. Dr. Thaler filed to register copyright for an AI-Generated Work with USCO. The application named the AI as the author and Dr. Thaler as the owner of the copyright in the work.

3. Defendants, in a final agency action, denied the copyright registration application on the basis that an AI-Generated Work "lacks the human authorship necessary to support a copyright claim."

4. Defendants also denied the copyright registration on the basis that Dr. Thaler was not entitled to apply for copyright registration for his submitted work.

5. The denial creates a novel requirement for copyright registration that is contrary to the plain language of the Copyright Act ("Act"), contrary to the statutory purpose of the Act, and contrary to the Constitutional mandate to promote the progress of science.

6. The denials are subject to judicial review under the Administrative Procedure Act (APA) 5 U.S.C. § 704. Plaintiff seeks injunctive and other relief as set forth below.

7. AI is continually getting better at creating AI-Generated Works. These works are going to be profoundly economically and socially disruptive, as they evolve from essentially academic pursuits to those having significant commercial value, including in the context of personalized music, journalism, and digital art.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction and is authorized to issue the relief sought under 5 U.S.C. §§ 701-06, 28 U.S.C. §§ 1331, 1338(a), 1361, and 2201-2022.

9. Venue is proper in this district under 28 U.S.C. § 1391(e).

## PARTIES

10. Plaintiff Dr. Stephen Thaler is an individual who resided in the State of Missouri at all times relevant to this complaint.

11.     As described more fully below, Plaintiff is the applicant for the copyright registration.

12.     Defendant Shira Perlmutter is named in her official capacity as the Register of Copyrights and Director of the United States Copyright Office. Under 17 U.S.C. § 701, the powers and duties of the Copyright Office are vested in the Register.

13.     Defendant the United States Copyright Office (USCO) is a department of the Library of Congress, responsible for registering copyright claims and maintaining records of copyright ownership.

## FACTUAL BACKGROUND

### I.      HISTORY OF THE APPLICATION

14.     Plaintiff is in the business of developing and using AI systems including those capable of creating "AI-Generated Works," here referring to output that would traditionally qualify for copyright protection and made under conditions in which no natural person contributed to the work as a traditional author.

15.     The present case involves Plaintiff's application to register a copyright for an AI-Generated Work produced by one of Plaintiff's AI systems referred to as a "Creativity Machine." The work is the two-dimensional artwork ("The Work") titled "A Recent Entrance to Paradise," reproduced below:



16.     On November 3, 2018, Plaintiff filed an application (#1-7100387071) to register the Work with the USCO.

17.     In the application, Plaintiff identified the author of the Work as the "Creativity Machine," and noted it was "Created autonomously by machine." Plaintiff listed himself as the "Copyright Claimant" alongside a transfer statement labelled "Ownership of the Machine."

18.     Plaintiff separately noted in the application that the Work was autonomously created by a computer and that he was entitled to own the copyright in the Work including by virtue of the work made for hire doctrine.

19.     On August 12, 2019, the USCO refused to register the claim based on the lack of human authorship. That refusal stated, "We cannot register this work because it lacks the human authorship necessary to support a copyright claim.  According to your application this work was 'created autonomously by machine.'" The refusal did not address Dr. Thaler's entitlement to any copyright in the Work.

4

## II.    PLAINTIFF'S REQUESTS FOR RECONSIDERATION

20.     Plaintiff filed two requests for reconsideration to the USCO on September 23, 2019, and May 27, 2020, respectively. Plaintiff confirmed that the submission lacked traditional human authorship. However, Plaintiff argued that the USCO's human authorship requirement was unsupported by law.

21.     In denying the first request for reconsideration, the USCO reiterated its response that the copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind." Citing to *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879). The USCO stated that since copyright law is limited to "original intellectual conceptions of the author," it refused to register the claim because it determined a human being did not create the Work. The USCO again cited to *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884), 17 U.S.C. § 102(a), and the Compendium of U.S. Copyright Office Practices § 306 (3d ed. 2017).

22.     On February 14, 2022, the USCO reconsidered Plaintiff's request the second time, and again refused to register the Work. The USCO accepted that the Work was autonomously created by artificial intelligence without any creative contribution from a human actor. Citing again to *In re Trade-Mark Cases*, the USCO stated that Plaintiff had failed to either provide evidence that the Work is the product of human authorship or convince the USCO to "depart from a century of copyright jurisprudence." Since there was no issue of human author involvement, the USCO limited its review to whether the human authorship requirement was unconstitutional and unsupported by case law.

23.     The USCO acknowledge that the phrase "original work of authorship" was "purposefully left undefined" by Congress in order to "incorporate without change the standard

5

of originality established by the courts under the [1909] copyright statute[,]" citing to H.R. Rep. No. 94-1476, at 51 (1976). The USCO also acknowledged that the Act leaves "unquestionably other areas of existing subject matter that [Bill 94-1476 did] not propose to protect but that future Congresses may want to."

24. The USCO cited again to *Burrow-Giles Lithographic Co.*, stating that copyright was afforded to photographers because photographs are "representatives of original intellectual conceptions of [an] author." *Id.*, at 57-59. Pointing out that the court referred to "authors" as human there. *Id.*, at 58. Citing to *Mazer v. Stein*, the USCO stated that the Supreme Court defined an author as someone who "may be viewed as an individual who writes an original composition," stating "the term in its constitutional sense, has been construed to mean an 'originator,' 'he to whom anything owes its origin.'" USCO argues this requires human authorship as an essential element of protection.

25. Providing additional examples for its decision, the USCO also referred to *Urantia Found v. Kristen Maaherra*, 114 F.3d 955, 957-959 (9th Cir. 1997), arguing the court refused to extend copyright protection to non-human creations. The USCO additionally referred to *Naruto v. Slater*, 888 F.3d 418, 426 (9th Cir. 2018) arguing a monkey cannot register a copyright because the Act specifically referred to an author's "children," "widow," "grandchildren," and "widower," which necessarily implied humans and excluded animals. The USCO acknowledged that it was unaware whether a court had considered the authorship of a copyright by artificial intelligence, but held that the decisions rejecting registration for non-human spiritual beings and animals supported its position.

26. The USCO also cited to the National Commission on New Technological Uses of Copyrighted Works ("CONTU") as support of its position. CONTU was mandated, in part, to

study the "creation of new works by the application or intervention of [] automatic systems of machine reproduction." In the final report in 1979, CONTU determined that the existing judicial construction requiring human authorship sufficiently enabled protection for works created with the use of computers, and that no amendment to copyright law was needed. CONTU specifically stated that eligibility of registration did not depend on the use of devices in its creation, but rather if there was the presence of at least minimal human creative effort at the time it was produced. The USCO failed to recognize that the language cited from CONTU did not specifically address works created solely by computers as it was assumed it was not possible for a machine to create autonomously at the time.

27. However, it stated that CONTU's position mirrored that of the USCO. The USCO stated that the practice manual for the office — the Compendium of U.S. Copyright Office Practices — "has long mandated human authorship for registration." The original Compendium implied that a work must owe its origin to a human being, and that materials provided solely by nature, by plants, or by animals were not copyrightable. Following that reasoning, the current Compendium provided examples of works that were not copyrightable, including automated computer translations, derivative sound recordings made purely by mechanical processes, human performance required for choreography and pantomimes, machine produced expression in visual arts works such as linoleum flooring, x-rays and other medical imaging, or hypertext markup language if created by a human being rather than a website design program.

28. Finally, the USCO stated that its position was supported by a recent report from the U.S. Patent and Trademark Office, where it sought public comment on whether a "work produced by an AI algorithm or process, without the involvement of a natural person… qualif[ies] as a work of authorship under the Copyright Act." It indicated in its report that the

"vast majority of commenters acknowledged that existing law does not permit a non-human to be an author [and that] this should remain the law." U.S. PATENT AND TRADEMARK OFFICE, PUBLIC VIEWS ON ARTIFICIAL INTELLIGENCE AND INTELLECTUAL PROPERTY POLICY at 19-21 (2020).

### III. USCO'S DENIAL OF COPYRIGHT REGISTRATION IS AN ARBITRARY AND CAPRICIOUS AGENCY ACTION AND NOT IN ACCORDANCE WITH THE LAW

#### A. The Plain Language of the Act Allows Protection of AI-Generated Works

29. The Act affords protection to "original works of authorship," a phrase which Congress left purposely undefined and for interpretation by the courts. 17 U.S.C. § 102(a). At no point does the Act limit authorship to natural persons. Indeed, corporations and other non-human entities have been considered "authors" for purposes of the Act for over a century. 17 U.S.C. § 101.

30. The bar for originality is low. "To qualify for copyright protection, a work must be original to the author." *Feist Publications, Inc. v. Rural Telephone Service Company, Inc.*, 499 U.S. 340, 345 (1991) (citation omitted). "Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Id.*, at 345 (citation omitted).

31. The Work meets all the requirements for copyright protection. Indeed, if Dr. Thaler had submitted the same AI-Generated Work with his company listed as the author, USCO would have granted his company a registration, and no one would have known the work was AI-Generated. The USCO argues that this is not cause for concern because "[a]pplicants who mislead the Office do so at their peril." But contrary to the USCO's argument, the USCO does

not test, or have a means to test, to see if a registration is being submitted for an AI-Generated Work, and USCO does not require, at least for works made for hire, that a human author be disclosed in a registration filing. It is very likely that other applicants have successfully registered copyright in AI-Generated Works without exhibiting Dr. Thaler's level of transparency.

32. Copyright protection for AI-Generated Works is entirely consistent with the text and purpose of the Act. It would promote the use and development of creative AIs which would generate socially and commercially valuable works, and it would protect the moral rights of human authors by preventing someone from falsely claiming credit for work done by a machine.

B. No Case Law Stands for the Proposition that an AI-Generated Work is Ineligible for Copyright Protection

33. The USCO cites to *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879) and to *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884) in support of its Human Authorship Requirement. *Compendium of U.S. Copyright Office Practices, Third Edition*, Section 306. This Human Authorship Requirement, of course, is a Copyright Office policy—not something created by statute. In fact, it is contrary to statute.

34. Certainly, any number of judicial opinions have discussed originality in the context of human-centric mental activity, but none of those opinions have considered an AI-Generated Work. It is hardly surprising that judgments from the Gilded Age would fail to consider the possibility of AI stepping into the shoes of a person and generating something creative. Dicta from such cases should therefore not be taken out of context to create a blanket prohibition on an entire field of publicly beneficial activity.

35. The appropriate takeaway from *Burrow-Giles*—which involved the Supreme Court holding for the first time that a photograph was eligible for copyright protection—is not that an AI cannot be an author, but rather that our courts have a long history of purposive interpretation of the Act in light of technological evolution.

36. Technology has advanced considerably since CONTU determined that AI-Generated Works were too speculative to consider in 1979. See NAT'L COMM'N ON NEW TECH. USES OF COPYRIGHTED WORKS, FINAL REPORT ON NEW TECHNOLOGICAL USES OF COPYRIGHTED WORKS 44 (1979). Today, AI can autonomously create works indistinguishable from a human being in terms of original and creative output. Applications allowing users and companies to utilize such AI to create AI-Generated Works are commercially available and rapidly increasing in use. *See, e.g.*, https://aiartists.org/ai-generated-art-tools.; *see, generally*, https://aiindex.stanford.edu/report/. AI, including Dr. Thaler's AI, are capable of producing creative output that, at least functionally, is equivalent to "the fruits of intellectual labor" that "are founded in the creative powers of the mind." *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879).

37. Courts associating mental activity with originality have not been using terms precisely or meaningfully in the context of AI-Generated Works. The problem of speaking precisely about such concepts with regards to computers was identified by Alan Turing, one of the founders of computer science, who in 1950 considered the question, "Can machines think?" *See* A.M. Turing, Computing Machinery and Intelligence, 59 MIND 433, 433–51 (1950). He found the question to be ambiguous, and the term "think" to be unscientific in its colloquial usage. *Id.*

38. Turing decided the better question to address was whether an individual could tell the difference between responses from a computer and an individual; rather than asking whether machines "think," he asked whether machines could perform in the same manner as thinking entities. *Id*. Turing's analysis from more than sixty years ago demonstrates that a test based on whether a machine is exhibiting "mental activity" would be ambiguous, challenging to administer, and of uncertain utility. The real question is whether a machine can make something indistinguishable from a person for purposes of copyright protection. The answer, as an undisputed factual matter here, is yes.

39. In addition to cases where courts have used human-centric language, USCO cites to two 9th Circuit cases it argues involves facts analogous to AI activity: animal art and works allegedly authored by spirits. First, neither is an appropriate analogy to AI-Generated Works. Second, neither case stands for the proposition claimed by USCO.

40. *Naruto v. Slater* involved a series of images that a black crested black macaque, named Naruto, took of himself in Indonesia. Naruto, by and through his Next Friends, People for the Ethical Treatment of Animals, Inc. (PETA), sued David Slater, who owned the camera used by Naruto and who subsequently used Naruto's photographs without permission. While USCO is correct that the case was dismissed, this was not based on the USCO's Human Authorship Requirement. The case was dismissed based on standing. As the 9th Circuit Court articulated, "We must determine whether a monkey may sue humans, corporations, and companies for damages and injunctive relief arising from claims of copyright infringement. Our court's precedent requires us to conclude that the monkey's claim has standing under Article III of the United States Constitution. Nonetheless, we conclude that this monkey—and all animals, since

they are not human—lacks statutory standing under the Copyright Act. We therefore affirm the judgment of the district court." *Naruto v. Slater*, 888 F.3d 418, 420 (9th Cir. 2018).

41. The present case, unlike *Naruto*, involves a human being suing for his ownership rights to property made by his machine. There is clearly no standing issue of the sort at issue in *Naruto*. If anything, *Naruto* emphasizes the importance of a purposive approach to statutory interpretation rather than a hyper-literal, textualist approach combined with over-reliance on dicta. Because, of course, if the 9th Circuit had literally intended for animals to be unable to sue under the Act, such a holding would prohibit many lawsuits. Human beings are, obviously, animals.

42. USCO also cites to, *Urantia Foundation v. Maaherra*, 114 F.3d 955 (9th Cir. 1997), which involved a book allegedly authored in part by a spiritual being. While a very interesting case in its own right and for a variety of reasons unrelated to AI-Generated Works, the 9th Circuit found that the book was protected by copyright regardless of any spiritual influences. "For copyright purposes, however, a work is copyrightable if copyrightability is claimed by the first human beings who compiled, selected, coordinated, and arranged the Urantia teachings, 'in such a way that the resulting work as a whole constitutes an original work of authorship.'" *Id*. at 958. "We hold that the human selection and arrangement of the revelations in this case could not have been so 'mechanical or routine as to require no creativity whatsoever.' We conclude, therefore, that the 'extremely low' threshold level of creativity required for copyright protection has been met in this case. *Id*. at 959 (citing *Feist*, *supra*, 499 at 345 ("The vast majority of works make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble, or obvious it might be.'")

43. The 9th Circuit even noted that, "The copyright laws, of course, do not expressly require 'human' authorship, and considerable controversy has arisen in recent years over the copyrightability of [AI-Generated Works]." *Id*. at 958. Without addressing the protectability of AI-Generated Works, the 9th Circuit held that, "[a]t the very least, for a worldly entity to be guilty of infringing a copyright, that entity must have copied something created by another worldly entity." *Id*. at 958. The present case lacks, on information and belief, any divine intervention.

44. There is nothing mystical about AI-Generated Works—Dr. Thaler's AI is the result of decades of his research and investment. Investment which the Act is intended to promote, along with the distribution of creative works. "Nothing in the text of the Copyright Clause confines the "Progress of Science" exclusively to "incentives for creation." *Golan v. Holder*, 565 U.S. 302 (2012). In *Golan*, the Supreme Court notes that inducing the dissemination of works by itself is an appropriate means to promote science.

      C. <u>Dr. Thaler is Entitled to The Work Under Common Law Principles of Property Ownership Including Accession and First Possession</u>

45. Copyright in a work can initially vest in an author. "Copyright in a work protected under this title vests initially in the author or authors of the work." 17 U.S.C. § 201(a). However, it is often the case that copyright in a work will instead initially vest in an author's employer, or in a party for whom a work was prepared. "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b). In addition, the ownership of copyright may be transferred by operation of law. "The ownership of a copyright may be

transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession." 17 U.S.C. § 201(d)(1).

46. An AI is not a legal person and does not have rights. It is therefore not possible for an AI to "own" intellectual property. An AI that creates an AI-Generated Work does not do so as a legal "employee" per se. It does so, at least in the present case, in its capacity as personal property.

47. Dr. Thaler owns and operates the AI which created The Work. He is therefore entitled to property created by his AI under principles and rules of property ownership including accession and first possession.

48. It is generally the case that where property creates additional property, the owner of the original property is entitled to the subsequent property. This rule, sometimes referred to as *accession*, applies in a variety of contexts. If a person owns a cow that births a calf, the cow's owner becomes calf's owner. If a person owns a fruit tree that bears fruit, the tree's owner owns the fruit. The tree owner derives title to the fruit through the tree, but this does not require the tree to execute a written document that transfers title to the fruit—the title to the fruit initially vests in the tree's owner by virtue of her relationship to the fruit tree.[1] *See generally* Thomas W. Merrill, Accession and Original Ownership, JOURNAL OF LEGAL ANALYSIS, 459-505 (2009).

---

[1] In some cases, third parties may have conflicting entitlement claims, such as a party picking fruit, but there are no conflicting claims to entitlement in the present case. Dr. Thaler is the only possible owner of The Work.

49. Here, Dr. Thaler's AI generated a piece of intellectual property that Dr. Thaler owns because he owns the AI. If the AI had been a 3D printer that created a physical painting of The Work, Dr. Thaler would own that painting as personal property. There is no reason why Dr. Thaler should be any less entitled to the property in a digital painting made by his AI.

50. Alternately, or in addition, if the Court holds that an AI-Generated Work is indeed proper subject matter for copyright protection, then Dr. Thaler owns copyright in The Work by virtue of being the first party to possess it. "[T]he common and civil law (both of which accept the desirability of private ownership) have responded with the proposition that the taking possession of unowned things is the only possible way to acquire ownership of them." Richard A. Epstein, Possession as the Root of Title, 13 Georgia Law Review 1221, 1222 (1979). The rule of first possession is simple, but like accession, foundational to functioning systems of private property. If the AI made a piece of property, and if no other party was entitled to ownership by virtue of their relationship to the AI, then The Work was unowned property which Dr. Thaler took title to by virtue of first possession.

51. Although the work for hire doctrine provides one statutory mechanism for a party other than an author to claim initial ownership, nowhere does the Act prohibit other ownership mechanisms including pursuant to common law rules of entitlement.

### D.  Dr. Thaler is Also Entitled to The Work Under the Work for Hire Doctrine

52. While an AI is not an employee, the Work for Hire Doctrine is sufficiently flexible to apply in this case. Dr. Thaler built and controlled the AI which generated The Work, The Work was only created by the AI at Dr. Thaler's insistence, and The Work only exists due to Dr. Thaler's investment.

53. The Supreme Court in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) identified factors that characterize an employment relationship under agency law. Those factors, including the employer's control over the work, control over the employee, and the status and conduct of an employee, all weigh heavily in favor of The Work being treated as a work for hire. *Id*., at 751-752. The AI is controlled by Dr. Thaler, the AI only operates at Dr. Thaler's direction, and the AI is owned as property by Dr. Thaler.

54. The central concern with overapplication of the work for hire doctrine is that it has the potential to exploit human authors. Employers might acquire copyrights not contemplated at the time of contracting and which would not be reflected in the agreed-upon price for employment or a work. *See*, *e.g.*, Anne Marie Hill, Work for Hire Definition in the Copyright Act of 1976: Conflict Over Specially Ordered or Commissioned Works, 74 Cornell L. Rev. 559, 569 (1989). Here, where the author is a machine that has no legal rights, there can be no concern about exploitation.

55. In addition to works created within the scope of employment, certain works created by independent contractors are also considered works-for-hire. 17 U.S.C. § 101. This requires that the parties "expressly agree in a written instrument signed by them that the work shall be considered a work for hire." *Id*. However, that requirement was again motivated by the desire to protect human authors. *See*, *e.g.*, Anne Marie Hill, Work for Hire Definition in the Copyright Act of 1976: Conflict Over Specially Ordered or Commissioned Works, 74 Cornell L. Rev. 559, 569 (1989). In this case, again, The Work was created by the AI while the AI was under his control and at Dr. Thaler's request and expense.  In the case of an AI-Generated Work, because an AI has no rights to protect, there is no need for a written instrument for its benefit.

56. While an AI is neither a legal employee nor an independent contractor capable of executing a contract, it functionally behaves as an employee or independent contractor in creating AI-Generated Works.

### E. AI Authorship is Consistent with the Purpose of the Act and the Constitution

57. It is important to interpret the Act consistent with its purpose and with the Constitution. Copyright protection is intended to promote the creation of socially valuable works. It is "intended definitely to grant valuable, enforceable rights to authors, publishers, etc., without burden-some requirements; 'to afford greater encouragement to the production of literary [or artistic] works of lasting benefit to the world.'" *Washingtonian Co. v. Pearson*, 306 U.S. 30, 36. It is also intended to promote dissemination of those works. *See*, *e.g.*, *Golan v. Holder*, 132 S. Ct. 873, 888 (2012). The Copyright Clause of the Constitution likewise is intended to promote the creation and dissemination of new works. Art. I, § 8, cl. 8. The Constitution provides for Copyright protection, "[n]ot primarily for the benefit of the author, but primarily for the benefit of the public, such rights are given." H.R. Rep. No 60-2222, at 7 (2d Sess. 1909).

58. Allowing protection of AI-Generated Works is required by the plain language of the Act. In 1973, the Supreme Court noted that the terms "Writings" and "Authors," have "not been construed in their narrow literal sense but, rather, with the reach necessary to reflect the broad scope of constitutional principles." *Goldstein v. California*, 412 U.S. 546, 561 (1973).

59. The Supreme Court has also articulated, "[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of its basic purpose." *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975). For instance, in *Aiken*, the issue was whether playing a radio in a restaurant constituted a performance and thus

17

an infringement. The meaning of performance was therefore ambiguous given the technology invented after the 1909 Copyright Act. The Supreme Court held that playing a radio in a restaurant was not a "performance." *Id.*, at 162. This was because of a simple logic that a passive listener cannot be a performer, and "those who listen do not perform, and therefore do not infringe." *Id.*, at 159 (citation omitted).

60. The Supreme Court has directly stated that "our inquiry cannot be limited to ordinary meaning and legislative history, for this is a statute that was drafted long before the development of the electronic phenomena with which we deal here." *Fort. Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 395 (1968). Thus, "[w]e must read the statutory language of 60 years ago in the light of drastic technological change." *Id.* In doing so, the Supreme Court defined an airing over its airwaves as a "performance" of copyright work. *Id.* Like *Aiken*, the court looked at the actual relationship between performers and listeners, to essentially determine what was going on within the ambit of the Act.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**(Administrative Procedure Act Violation for Denial of Plaintiff's Application)**

61. Plaintiff re-alleges and incorporates by reference every allegation contained in the proceeding paragraphs.

62. The USCO's second refusal to register the Work constituted final agency action and Plaintiff seeks to reverse that refusal here.

63. For the reasons stated above, requiring human authorship for registration of copyright in a work is contrary to law.

64. Defendants' refusal to register the copyright claim in the work is contrary to law.

65. The agency actions here were arbitrary, capricious, an abuse of discretion and not in accordance with the law, unsupported by substantial evidence, and in excess of Defendants' statutory authority.

66. The refusal to register the copyright claim in the Work should be set aside and the application reinstated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Issue an order compelling Defendants to set aside their refusal to register the Work.

2. Award of costs and its reasonable attorney's fees to Plaintiff; and

3. All other relief as may be appropriate.

Dated: June 2, 2022                    **BROWN, NERI, SMITH & KHAN LLP**

By: __/s/ Geoffrey A. Neri_____
Geoffrey A. Neri, Esq. (CA00125)
Ryan Abbott, Esq. (*applying pro hac vice*) 11601 Wilshire Blvd, Ste. 2080
Los Angeles, CA 90025
Phone: (310) 593-9890
Fax: (310) 593-9980
Geoff@bnsklaw.com
Ryan@bnsklaw.com

Attorneys for Plaintiff