# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WASHINGTON D.C.

| | |
|---|---|
| Stephen Thaler, an individual<br><br>*Plaintiff*,<br><br>v.<br><br>Shira Perlmutter, in her official capacity as Register of Copyrights and Director of the United States Copyright Office; and The United States Copyright Office;<br><br>*Defendants.* | Case No. 1:22-cv-01564-BAH<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF** |

Plaintiff, Dr. Stephen Thaler ("Plaintiff"), by his undersigned attorneys, respectfully moves the Court, pursuant to Fed. R. Civ. P. 56, Local Rules 7(h)(2) and 7(n), the APA, and Copyright Act, for an order granting summary judgment in favor of Plaintiff on the grounds that no genuine issue as to any material fact exists and Plaintiff is entitled to judgment as a matter of law. Support for this motion is set forth in the accompanying Memorandum of Points and Authorities in Support, and the administrative record, ECF No. 13-2-8. Plaintiff's requested relief is set forth in the accompanying Proposed Order. Plaintiff respectfully requests oral argument on this motion.

Dated: January 10, 2023

BROWN, NERI, SMITH & KHAN LLP

By:       */s/ Ryan Abbott*
      Ryan Abbott, Esq. (*pro hac vice* granted)
      Timothy Lamoureux, Esq. (*pro hac vice*
      application pending)

1

Geoffrey A. Neri, Esq. VSB No. 72219
11601 Wilshire Blvd, Ste. 2080
Los Angeles, CA 90025
Phone: (310) 593-9890
Fax: (310) 593-9980
Ryan@bnsklaw.com
Tim@bnsklaw.com
Geoff@bnsklaw.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF WASHINGTON D.C.**

| | |
|---|---|
| Stephen Thaler, an individual | Case No. 1:20-cv-00903-LMB-TCBVAED |
| *Plaintiff,* | **BRIEF IN SUPPORT** |
| v. | |
| Shira Perlmutter, in her official capacity as Register of Copyrights and Director of the United States Copyright Office; and The United States Copyright Office; | |
| *Defendants.* | |

**BRIEF IN SUPPORT OF**

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Ryan Abbott, Esq. (*pro hac vice* granted)
Timothy Lamoureux, Esq. (*pro hac vice* application pending)
Geoffrey A. Neri, Esq. VSB No. 72219
11601 Wilshire Blvd, Ste. 2080
Los Angeles, CA 90025
Phone: (310) 593-9890
Fax: (310) 593-9980
Ryan@bnsklaw.com
Tim@bnsklaw.com
Geoff@bnsklaw.com

*Attorneys for Plaintiff*

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................ii-vi

I.      INTRODUCTION AND SUMMARY OF ARGUMENT .................................1

II.     STATEMENT OF UNDISPUTED MATERIAL FACTS ...............................2

III.    LEGAL STANDARD...................................................................................6

IV.     ARGUMENT ...............................................................................................7

        A.  The Work Is Copyrightable ...............................................................7

            1.    The Act's Plain Language Establishes That AI-Generated Works
                  Are Copyrightable…………………………………………………7

            2.    Should the Court Consider the Copyright Act Ambiguous, the
                  Purpose of the Act Must be Considered and Requires
                  Protection of AI-Generated Works………………………………...9

                  a.    Courts Have Recognized that Technologica
                        Advancement Can Cause Ambiguity in the Copyright
                        Act………………………………………………………..…9

                  b.    The Purpose of the Copyright Act Requires Protection
                        of AI-Generated Works…………………………………..10

                  c.    The Supreme Court, Applying the Purpose of Copyright,
                        Has Expanded the Scope of Copyright, Reading the Act
                        Expansively, Not Regressively as the USCO Urges……...13

                  d.    The USCO's Interpretation of the Act Is Not Entitled to
                        Deference…………………………………………………...15

        B.  Dr. Thaler Is the Owner of the Copyright in the Work Either By
            Common Law Property Principles or, in the Alternative, Because
            as a Work For Hire Ownership Originally Vested in Him  ...........................20

            1.    Accession And The Right of First Possession Both Allow Dr.
                  Thaler to Be an Owner By Operation of Law……………………20

                  a.    General Principles of Property Begetting Property
                        Remaining with the Property Owner Provide the
                        Copyright to Dr. Thaler…………...……………………..21

                  b.    Dr. Thaler Has the Right of First Possession to the
                        Copyright…………………………………………………...22

i

2.      Alternatively, the Work Is a Work-For-Hire and Dr.
Thaler Its Author……………………………………………….24

V.     CONCLUSION.........................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Action Tapes, Inc. v. Mattson*,
  462 F.*3d* 1010 (8th Cir. 2006) ................................................................................................. 15

*Alfred Bell & Co. v. Catalda Fine Arts, Inc.*,
  191 F.2d 99 (2d Cir. 1951)....................................................................................................... 8

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
  934 F.3d 649 (D.C. Cir. 2019) (quoting 5 U.S.C. § 706.). .................................................... 6

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C.Cir.2001) ................................................................................................ 7

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*,
  118 F. Supp. 3d 388 (D.D.C. 2015) ........................................................................................ 6

*Aymes v. Bonelli*,
  980 F.2d 857 (2d Cir. 1992)................................................................................................... 27

*Bell Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.*,
  No. C 93–20079 JW, 1995 WL 836331, at *3 (N.D. Cal. Dec. 14, 1995) ............................ 14

*Bleistein v. Donaldson Lithographing Co.*,
  *188* U.S. 239, 23 S. Ct. 298, 47 L. Ed. 460 (1903)................................................................. 9

*See Brown v. Legal Found. Of Washington*,
  *538* U.S. 216 (2003)............................................................................................................... 22

*Burrow-Giles Lithographic Co. v. Sarony*,
  *111* U.S. 53 (1884), 17 U.S.C. § 102(a)......................................................................... *passim*

*Callaghan v. Myers*,
  128 U.S. *617* (1888)............................................................................................................... 24

*Carruth v. Easterling*,
  150 So.2d 852 (Miss. 1963).................................................................................................... 22

*Centennial Life Ins. v. Poston*,
  88 F.3d 255 (4th Cir.1996) ..................................................................................................... 19

*Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) .......................................................................................... 15, 16

*\*Community for Creative Non-Violence v. Reid*,
    490 U.S. 730 (1989) .......................................................................................... 26

*Coykendall v. Eaton*,
    37 How. Pr. 438 (N.Y. Gen. Term 1869). ........................................................ 23

*Fantasy, Inc. v. Fogerty*,
    664 F. Supp. 1345, 1356 (N.D. Cal. 1987), *aff'd,* 984 F.2d 1524 (9th Cir. 1993),
    *rev'd, on other grounds* 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994) ................ 21

*\*Feist Publications, Inc. v. Rural Telephone Service Company, Inc.*,
    499 U.S. 340 (1991) .......................................................................................... 8, 11

*Golan v. Holder*,
    132 S. Ct. 873 (2012). ...................................................................................... 11

*Fort. Corp. v. United Artists Television, Inc.*,
    392 U.S. 390, 395 (1968) .................................................................................. 14, 19

*Fox Television Stations, Inc. v. FilmOn X LLC*,
    150 F. Supp. 3d 1, 25 (D.D.C. 2015) ................................................................ 16

*Gerlach-Barklow Co. v. Morris & Bendien*,
    23 F.2d 159 (2d Cir. 1927) ................................................................................ 24

*\*Golan v. Holder*, 132 S. Ct. 873 (2012) ................................................................ 10

*Goldstein v. California*,
    412 U.S. 546 (1973) .......................................................................................... 5, 14, 17

*Google LLC v. Oracle Am., Inc.*,
    141 S. Ct. 1183 (2021) ...................................................................................... 10

*Gonzales v. Oregon*,
    546 U.S. 243 (2006) .......................................................................................... 16

*Griffin v. Sheeran*,
    351 F. *Supp*. 3d 492 (S.D.N.Y. 2019 .............................................................. 20

*Harper & Row, Publishers,* Inc. *v. Nation Enters*.,
    471 U.S. 539 (1985) .......................................................................................... 11

iii

*Horror, Inc. v. Miller*,
   15 F.4th 232 (2d Cir. 2021) ................................................................. 24

*Houghton Mifflin Co. v. Stackpole Sons, Inc.*,
   04 F.2d 306., 311 (2d Cir.), *cert. denied*, 308 U.S. 597, 60 S.Ct. 131,
   84 L.Ed. 499 (1939) ....................................................... 20, 21, 24

*In re C Tek Software*, *Inc.*,
   127 B.R. 501, (Bankr. D.N.H. 1991). ................................................ 23

*In re Trade-Mark Cases*,
   100 U.S. 82 (1879) .......................................................... *passim*

*Marshall County Health* Care *Auth. v. Shalala*,
   988 F.2d 1221 (D.C.Cir.1993). ........................................................... 7

*Mazer v. Stein*,
   347 U.S. 201 (1953) .................................................... 5, 11, 17

*\*Mohamad v. Palestinian Authority*,
   566 U.S. 449 (2012). ......................................................... 8, 26

*Naruto v. Slater*,
   888 F.3d *418* (9th Cir. 2018) ..................................... 5, 19, 20

*Nebraska v. Iowa*,
   143 U.S. *359* (1892) ...................................................... 22

*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*,
   684 F.2d 821 (11th Cir. 1982). ...................................................... 8

*Pierson v. Post*,
   3 Cai. 175 (N.Y. Sup. Ct. 1805)................................................. 24

*Philips v. Washington Legal Found*,
   524 U.S. 156 (1998)............................................................. 22

*Photocure ASA v. Kappos*,
   603 F.3d 1372 (Fed. Cir. 2010)................................................... 16

*Pub. Emps. Ret. Sys. of Ohio v. Betts*,
   492 U.S. 158 (1989).) .......................................................... 15

*Roulo v. Russ Berrie & Co.*,
   886 F.2d 931(7th Cir. 1989) ...................................................... 9

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) .......................................................................................... 7

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ................................................................................... 15, 16

*Smith v. City of Jackson, Miss.*,
   544 U.S. 228 (2005) ....................................................................................... 15

*Sony Corp. of America v. Universal City Studios, Inc.*,
   464 U.S. 417 (1984) ....................................................................................... 10

*\*Twentieth Century Music Corp.v. Aiken*,
   *422* U.S. at 151 (1975) ........................................................................ 10, 13, 18

*United States v. Paramount Pictures, Inc.*,
   334 U.S. 131 (1948) ....................................................................................... 10

*U.S. Home Corp. v. R.A. Kot Homes, Inc.*,
   563 F.Supp.2d 971 (D.Minn. 2008 ................................................................. 21

*Urantia Found v. Kristen Maaherra*,
   114 F.3d 955 (9th Cir. 1997) ............................................................... 5, 19, 20

*Vitaphone Corp. v. Hutchinson Amusement Co.*,
   28 F. Supp. 526 (D. Mass. 1939) ..................................................................... 9

*Washingtonian Co. v. Pearson*,
   *306* U.S. 30 (1939) ......................................................................................... 11

*Webb's Fabulous Pharmacies v. Beckwith*,
   449 U.S. 155 (1980) ....................................................................................... 22

*Wihtol v. Wells*,
   231 F.2d *550* (7th Cir. 1956) ........................................................................... 8

**Statutes and Regulations**

17 U.S.C. § 101 ........................................................................................... 26, 27

17 U.S.C. § 102(a) ............................................................................................. 7

17 U.S.C. § 201 ................................................................................................ 24

17 U.S.C. § 201(b) ........................................................................................... 26

17 U.S.C. § 204(a) ................................................................................ 20

17 U.S.C. § 301(a) .................................................................................. 7
17 U.S.C. § 302 ...................................................................................... 9

5 U.S.C. § 706 ........................................................................................ 6

5 U.S.C. § 706(2) .................................................................................... 7

**Other Authorities**

*Act of March 4,* 1909*, ch. 320*, 35 Stat. 1075. ...................................... 9

*Author*, Merriam-Webster Dictionary (2022) ......................................... 8

*Employ*, Merriam-Webster Dictionary (2023). ..................................... 26

*Employee*, Merriam-Webster Dictionary (2023). .................................. 26

*One*, Merriam-Webster Dictionary (2023) ......................................... 8, 26

*Compendium of U.S. Copyright Office Practices, Third Edition*, Section 306 .......................... 16

*Arthur Miller, *Copyright Protection for Computer Programs, Databases, and Computer-Generated Works: Is anything new since CONTU?*, 106 HARV. L. REV 977(1993)....... 10, 17

Arthur Miller, *Computers and Authorship: The Copyrightability of Computer-Generated Works,* WIPO WORLDWIDE SYMPOSIUM ON THE INTELLECTUAL PROPERTY ASPECTS OF ARTIFICIAL INTELLIGENCE (1991),
https://www.wipo.int/edocs/pubdocs/en/wipo_pub_698.pdf. at 245-246. ............................. 18

Jane C. Ginsburg, *A Tale of Two Copyrights: Literary Property in Revolutionary France and America.* 64 *TUL. L. REV.* 991 (1989). ................................. 12

João Marinotti, *Possessing Intangibles*, 116 Nw. U. L. Rev. 1227 (2022) ................................ 23

Richard A. Epstein, Possession as the Root of Title, 13 Georgia Law Review 1221 (1979)....... 23

Sterk, "Rhetoric and Reality in Copyright Law," 94 MICH. L. REV. 1197 (1996) ................... 11

*The* Cathach */ The Psalter of St Columba*, ROYAL IRISH ACADEMY (Aug. 31, 2015),
www.ria.ie/cathach-psalter-st-columba (last visited Aug 7, 2022)........................................... 22

Thomas W. Merrill, *Accession and Original Ownership*, 1 J. Legal Analysis 459 (2009).... 21, 22

H.R. Rep. No. 94-1476, at 51 (1976)........................................................ 5

H.R. 28192. H.R. REP. No. 2222, 60th Cong., 2d Sess. (1909)..................................................... 12

H.R. REP. No. 2222, 60th Cong., 2d Sess. (1909) at 5. ............................................................... 13

H.R. REP. 94-1476, 51, 1976 U.S.C.C.A.N. 5659, 5664. ............................................................ 13

Local Rule 56(a) ...................................................................................................................... 6

Copyright Act of 1909 ......................................................................................................... 12, 14

**TREATISES**

1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.01(A)(1)
   (rev. ed.2022)……………………………………..……………………………………9, 25

## I.   <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

With the facts not in dispute, this case boils down to one novel legal question: Can someone register a copyright in a creative work made by an artificial intelligence ("AI-Generated Work")? The plain language and purpose of the Copyright Act ("Act") agree that such works should be copyrightable. In addition, standard property law principles of ownership, as well as the work-for-hire doctrine, apply to make Plaintiff Dr. Stephen Thaler ("Dr. Thaler") the copyright's owner.

Dr. Thaler created an AI that he directed to create artwork. It successfully did so, creating a piece named "A Recent Entrance to Paradise" (the "Work").

However, when Dr. Thaler attempted to register the Work with the United States Copyright Office ("USCO"), the agency denied the registration, proclaiming that the office has a "Human Authorship Requirement" policy that applies to creative works, and that they will only register a human-made work.

This policy is unsupported by law. The plain language of the Copyright Act (the "Act") does not restrict copyright to human-made works, nor does any case law. The USCO mistakenly relies on dicta, predominantly from cases predating even the existence of modern computers, together with inappropriate reliance on a technical report that pre-dates autonomously creative AI. Unfortunately, the USCO's policy frustrates the purpose of the Act which is to promote the dissemination and creation of works. By contrast, allowing copyright on AI-Generated Works encourages the development and use of creative AI which results in the generation of more works, and provides incentives for those works to be disseminated.

The Work is therefore copyrightable and it belongs to Dr. Thaler. This ownership follows from bedrock property law principles, namely, that when someone has property that generates additional property, like a tree bearing fruit, a cow having a calf, or a 3D printer making a physical painting, the owner of the original property owns the subsequent property. Dr. Thaler is also the owner based on being the first possessor of the Work, as first possession is a basis for ownership. Finally, given the way the AI was created, how it operates, and Dr. Thaler's

1

ownership of it, there is no need to transfer property from the AI, as he could be the author pursuant to the work-for-hire doctrine, and therefore the original owner.

Plaintiff moves for summary judgment as to the legal issue alone—whether an AI-Generated Work is copyrightable.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 7(h), Plaintiff Dr. Stephen Thaler ("Thaler"), submits this statement of material facts as to which there is no genuine issue.

1.      Plaintiff Dr. Stephen Thaler develops, owns, and applies AI systems capable of generating creative output that would historically qualify for copyright protection and that are made under conditions in which no natural person contributed to the work as a traditional author ("AI-Generated Works"). *See* US_26[1] ("In the present case, the current applicant, Stephen Thaler, is the owner of the AI that generated the CGW and should thus be the owner of any copyright. Stephen Thaler was also the AI's user and programmer.")

2.      Plaintiff's AI system produced a two-dimensional artwork (the "Work") titled "A Recent Entrance to Paradise," reproduced below:

---

[1] The Administrative Record was filed by the USCO as Docket Entry 13. The USCO Bates Stamped the pages of the record US_0000001-37. For simplicity, given the small number of pages comprising the Administrative Record, it shall be referred to using the USCO's Bates prefix following by up to two digits.



US_31.

3.      On November 3, 2018, Plaintiff filed an application (#1-7100387071) to register the Work with the United States Copyright Office. US_01-03.

4.      In the application, Plaintiff identified the author of the Work as "Creativity Machine," and noted it was "Created autonomously by machine." *Id*. at 02. Plaintiff listed himself as the "Copyright Claimant" alongside a transfer statement labelled "Ownership of the Machine." *Id*.

5.      Plaintiff separately noted in the application that the Work was autonomously created by a computer and that he was entitled to own the copyright in the Work including by virtue of the work made for hire doctrine. *Id*.

6.      On August 12, 2019, the USCO refused to register the claim based on the lack of

human authorship. That refusal stated, "We cannot register this work because it lacks the human authorship necessary to support a copyright claim. According to your application this work was 'created autonomously by machine.'" US_05. The refusal did not address Dr. Thaler's entitlement to any copyright in the Work. *See id.*

7.      Plaintiff filed two requests for reconsideration to the USCO on September 23, 2019, and May 27, 2020, respectively. US_09-16, US_23-30. Plaintiff confirmed that the submission lacked traditional human authorship. *Id.* However, Plaintiff argued that the USCO's human authorship requirement was unsupported by law. *Id.*

8.      In denying the first request for reconsideration, the USCO reiterated its response that the copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind." Citing to *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879). US_19. The USCO stated that since copyright law is limited to "original intellectual conceptions of the author," it refused to register the claim because it determined a human being did not create the Work. *Id.* The USCO again cited to *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58(1884), 17 U.S.C. § 102(a), and the Compendium of U.S. Copyright Office Practices § 306 (3ded. 2017). *Id.*

9.      On February 14, 2022, the USCO reconsidered Plaintiff's request the second time, and again refused to register the Work. US_31-37. The USCO accepted that the Work was "autonomously created by artificial intelligence without any creative contribution from a human actor." US_32. Citing again to *In re Trade-Mark Cases*, the USCO stated that Plaintiff had failed to either provide evidence that the Work is the product of human authorship or convince the USCO to "depart from a century of copyright jurisprudence." US_33. Since there was no issue of human author involvement, the USCO limited its review to whether the human authorship requirement was unconstitutional and unsupported by case law. *See* US_31-37.

10.      The USCO stated that the phrase "original work of authorship" was "purposefully left undefined" by Congress in order to "incorporate without change the standard of originality established by the courts under the [1909] copyright statute[,]" citing to H.R. Rep.

No. 94-1476, at 51 (1976). US_33-34. The USCO further stated that the Act leaves "unquestionably other areas of existing subject matter that [Bill 94-1476 did] not propose to protect but that future Congresses may want to." *Id*.

11.     The USCO cited again to *Burrow-Giles Lithographic Co.*, stating that copyright was afforded to photography because photographs are "representatives of original intellectual conceptions of [an] author," observing that the court referred to "authors" as human. US_34. Citing to *Mazer v. Stein*, the USCO stated that the Supreme Court defined an author as someone who "may be viewed as an individual who writes an original composition." US_34. The USCO further relied on the stating *Goldstein v. California*, citing that "the term in its constitutional sense, has been construed to mean an 'originator,' 'he to whom anything owes its origin.'" *Id*. USCO argues this requires human authorship as an essential element of protection. *Id*.

12.     Providing additional examples for its decision, the USCO also referred to *Urantia Found v. Kristen Maaherra*, 114 F.3d 955, 957-959 (9th Cir. 1997), arguing the court refused to extend copyright protection to non-human creations. US_34-35. The USCO additionally referred to *Naruto v. Slater*, 888 F.3d 418, 426 (9th Cir. 2018) arguing a monkey cannot register a copyright because the Act specifically referred to an author's "children," "widow," "grandchildren," and "widower," which necessarily implied humans and excluded animals. The USCO acknowledged that it was unaware whether a court had considered the authorship of a copyright by artificial intelligence but argued that the decisions rejecting registration for non-human spiritual beings and animals supported its position. US_35.

13.     The USCO also cited to the National Commission on New Technological Uses of Copyrighted Works ("CONTU") as support of its position. CONTU was mandated, in part, to study the "creation of new works by the application or intervention of [] automatic systems of machine reproduction." US_35. In the final report in 1979, CONTU determined that the existing judicial construction requiring human authorship sufficiently enabled protection for works created with the use of computers, and that no amendment to copyright law was needed. US_35-

36. CONTU specifically stated that eligibility of registration did not depend on the use of devices in its creation, but rather if there was the presence of at least minimal human creative effort at the time it was produced. US_35.

14.     Finally, USCO cited to "a recent report from the U.S. Patent and Trademark Office ("USPTO") addressing intellectual property issues raised by AI." In its summary of responses, USPTO stated that "the vast majority of commenters acknowledged that existing law does not permit a non-human to be an author [and] this should remain the law." US_36.

## III.   <u>LEGAL STANDARD</u>

Under the APA, "the statute provides that [the Federal Courts] 'decide all relevant questions of law' and "interpret . . . statutory provisions.' We ordinarily set aside agency actions that are either 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' or 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'" *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 662 (D.C. Cir. 2019) (quoting 5 U.S.C. § 706.).

"[W]hen, as here, the court is reviewing a final agency action under the APA, the standard set forth in Rule 56(a) does not apply. Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is a more limited one: to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015) (internal quotation marks and citations omitted). As the Court of Appeal has further explained, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal . . . [t]he 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F. 3d 1077, 1083 (D.C.Cir.2001) (quoting *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C.Cir.1993).)

Plaintiff seeks an order compelling Defendants to reinstate the Applications and vacate the prior decision on the petition for registration of copyright. Under the APA, the Court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A)

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B)
contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory
jurisdiction, authority, or limitations, or short of statutory right . . ." 5 U.S.C. § 706(2). The court
must judge the propriety of the agency's action based "solely [on] the grounds invoked by the
agency" when it made the challenged decision. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

IV.   **ARGUMENT**

　　　A.   **The Work Is Copyrightable**

　　　　　3.   The Act's Plain Language Establishes That AI-Generated Works
　　　　　　　Are Copyrightable

　　　It is undisputed that the Work constitutes a fixed, visual artwork that would be protected
under the Act had it been created through traditional human labor. The sole basis for the USCO's
refusal to register the Work is because it claims that copyright protection is limited to "creations
of human authors."[2] US_34. The USCO does not clarify whether its "Human Authorship
Requirement" is a requirement related to authorship in of itself or the standard for originality, but
in either case, the Work satisfies the requirements set forth in the Copyright Act, as it constitutes
an "original work[] of authorship." 17 U.S.C. § 102(a); 17 U.S.C. § 301(a).

　　　The Supreme Court set forth a method for determining a phrase's "ordinary meaning"
when reading an undefined statutory term by first checking the dictionary. *See Mohamad v.
Palestinian Authority*, 566 U.S. 449, 456-57 (2012). In this instance, the language in the Act never
states that an author must be a human being, though it would have been simple to explicitly state
as much. The dictionary defines an author as, "one that originates or creates something." *Author*,
Merriam-Webster Dictionary (2022).  Likewise, "one" does not denote a legal person, as it is
defined as "a single person or *thing*." *One*, Merriam-Webster Dictionary (2023) (Emphasis

---

[2] To the extent that there is any question as to the level of creativity a machine is capable of, the
procedural posture of the case is that the Creativity Machine did make an "original work," and it
is not a mere copy of another work. 17 U.S.C. § 102(a). Thus, to the extent there is any argument
as to the capability of the machine to create a work, that is not in dispute and cannot form the
basis of the Copyright Office's, or this Court's, determination of the issues. As such, issues as to
the independent efforts are not relevant.

added.) Under a dictionary definition, the Creativity Machine literally qualifies as an author.
What the the Act's language indicates is that when an entity—a person, a business, a machine—
generates a creative work, that entity is the author.[3]

To the extent USCO argues an AI cannot generate an objectively original or creative
work, the bar for originality and creativity is low. "To qualify for copyright protection, a work
must be original to the author." *Feist Publications, Inc. v. Rural Telephone Service Company,
Inc.*, 499 U.S. 340, 345 (1991) (citation omitted). "Original, as the term is used in copyright,
means only that the work was independently created by the author (as opposed to copied from
other works), and that it possesses at least some minimal degree of creativity." *Id.*, at 345
(citation omitted); *e.g. Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99 (2d Cir. 1951)
(Originality is "little more than a prohibition of actual copying. No matter how poor the
'author's' addition, it is enough if it be his own.'" (Quoting *Wihtol v. Wells*, 231 F.2d 550 (7th
Cir. 1956)); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821 (11th Cir.
1982).

Thus, as a *factual* matter, an AI system created an artwork that objectively meets the
standard for originality. The Work "owes its origin" to the Creativity Machine and was a
"product of the independent efforts of the author," which is the small hurdle required to reach
copyrightability. *See* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* §
2.01(A)(1) (rev. ed.2022). USCO cannot point to a statutory prohibition on AI-Generated
Works,[4] so it instead grandiosely claims that "a century of copyright jurisprudence" supports its

---

[3] Additionally, 17 U.S.C. § 101 includes a definition for an "anonymous work" that contemplates
a "work . . . of which no natural person is identified as author," and the Act has a full framework
of how to treat such works.
[4] The Act, instead, explicitly accommodates non-human authors. For instance, It is not
controversial that a non-human entity can be an author under the work for hire theory, but in this
case the author *is* a human. Corporations, for instance, have able to be authors since long before
the current inception of the Copyright Act. *See e.g. Vitaphone Corp. v. Hutchinson Amusement
Co.*, 28 F. Supp. 526, 529 (D. Mass. 1939) ("Assuming the corporation in the present case, or
any other corporation, is incapable of exercising intellect so as to be primarily entitled to secure
copyright, yet it is perfectly plain that a corporation can be 'an employer in the case of works
made for hire' under the terms of the statute, and entitled to copyright.") Thus, given how the
Act treats works for hire, in general, anonymous, and pseudonymous works, by divorcing

position. US_33. But, in fact, the only thing USCO has to support its position is dicta. US_33. So much so, that the cases that USCO cites in support of its Human Authorship Requirement in its Compendium—*Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884) and *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879)—are from the 19th century and greatly predate even the invention of the first modern computers. The USCO admits it is aware of no case that prohibits the protection of an AI-Generated Work. The fact that various courts have referred to creative activity in human-centric terms, based on the fact that creativity has traditionally been human-centric and romanticized, is very different than there being a legal requirement for human creativity. Works of creativity, containing anything unique to its creator, is subject to "copyright unless there is a restriction in the words of the act." *See Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 250, 23 S. Ct. 298, 47 L. Ed. 460 (1903). Of course, corporate authorship has also been a fixture of American copyright law for more than a century. *Act of March 4, 1909, ch. 320*, 35 Stat. 1075.

Here, there should be no question that the Work is adequately creative and original. It contains visual elements arranged in a novel way, which merits protection. *See e.g. Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 939 (7th Cir. 1989) ("just as individual words do not deserve copyright protection, it is the unique combination of these common elements which form the copyrighted material."). This is required by the plain language of the Act and its ordinary meaning, and no case stands to the contrary.

    4.    Should the Court Consider the Copyright Act Ambiguous, the Purpose of the Act Must be Considered and Requires Protection of AI-Generated Works

    *a.*    *Courts Have Recognized that Technological Advancement Can Cause Ambiguity in the Copyright Act*

The Supreme Court has made it clear that technological changes must be considered when

---

duration from an author's "lifetime," the Act currently fully accommodates nonhuman authors. *See* 17 U.S.C. § 302.

interpreting the Copyright Act, because "[w]e have understood the provision to set forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances, including 'significant changes in technology.'" *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021) (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984).) The present case is a clear example of technological evolution requiring purposive analysis. At the time of the Act's adoption in 1976, AI-Generated Works were not yet a reality. USCO cites to the 1979 CONTU report in support of its position, but ignores that CONTU did not seriously consider the possibility of AI-Generated Works as they were considered "too speculative" at the time. Arthur Miller, *Copyright Protection for Computer Programs, Databases, and Computer-Generated Works:  Is anything new since CONTU?*, 106 HARV. L. REV 977, 1066 (1993). Now that, as a factual matter, the universe of authorship has expanded to include AI, there is a need to consider how the purpose of the Act can best be achieved in light of technological advances.

> b. *The Purpose of the Copyright Act Requires Protection of AI-Generated Works*

The purpose of the Copyright Act arises out of the Constitutional mandate "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." *Id*. The Copyright Clause has been interpreted by the Supreme Court to provide an explicit rationale for granting copyright protection—namely to encourage the creation and dissemination of works for the public benefit rather than for the purpose of benefiting authors.

Copyright is "intended definitely to grant valuable, enforceable rights to authors, publishers, etc., without burden-some requirements; 'to afford greater encouragement to the production of literary [or artistic] works of lasting benefit to the world.'" *Washingtonian Co. v. Pearson*, 306 U.S. 30, 36 (1939). The Act is also intended to promote dissemination of those works. *See*, *e.g.*, *Golan v. Holder*, 132 S. Ct. 873, 888 (2012).

Protection of AI-Generated Works is consistent with this constitutional mandate and the Copyright Act, as the Supreme Court has reiterated rewarding authors is subordinate to incentivizing the dissemination of creative works. "The immediate effect of our copyright law is to secure a fair return for an author's creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good." *Twentieth Century Music Corp.,* 422 U.S. at 156; *see also United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948) ("It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius."); Sterk, "Rhetoric and Reality in Copyright Law," 94 MICH. L. REV. 1197, 1203 (1996) ("[I]t is incentive language that pervades the Supreme Court's copyright jurisprudence."). "The primary objective of copyright is not to reward the labor of authors, but '[t]o promote the Progress of Science and useful Arts.'" *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349 (1991) (alteration in original); *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985) ("It is evident that the monopoly granted by copyright actively served its intended purpose of inducing the creation of new material of potential historical value."). Likewise, In *Mazer v. Stein*, the Court articulated that, "the economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and the useful arts.'" *Mazer v. Stein*, 347 U.S. 201, 219 (1953).

Congress has been equally consistent in finding that the purpose of Copyright is to promote the generation and dissemination of works. Congress passed its first Copyright Act in 1790, which inherited numerous provisions from the Statute of Anne. The Act stated it was "for the encouragement of learning, by securing copies of maps, charts, and books, to the authors and proprietors of such copies, during the times therein mentioned."  Authors and proprietors are mentioned, but the public remained the law's primary beneficiaries. Jane C. Ginsburg, *A Tale of Two Copyrights: Literary Property in Revolutionary France and America.* 64 *TUL. L. REV.* 991, 1015, (1989). ("Congress adopted a rather pragmatic view of the kinds of works that achieved

that objective: the first copyright law protected maps, charts, and books-in that order. The great majority of works for which authors or publishers sought copyright protection under that first statute were highly useful productions.").

As American copyright law continued to develop, Congress continued to emphasize its public-centric focus. In submitting the bill that became the Copyright Act of 1909,[5] the House of Representatives committee responsible for the bill submitted a report, also adopted by the Senate, noting the following:

> The enactment of copyright legislation by Congress under the terms of the Constitution is not based upon any natural right that the author has in his writings, for the Supreme Court has held that such rights as he has are purely statutory rights, but upon the ground that the welfare of the public will be served and progress of science and useful arts will promoted by securing to authors for limited periods the exclusive rights to their writings. The Constitution does not establish copyrights, but provides that Congress shall have the power to grant such rights if it thinks best. Not primarily for the benefit of the author, but primarily for the benefit of the public, such rights are given. Not that any particular class of citizens, however worthy, may benefit, but because the policy is believed to be for the benefit of the great body of people, in that it will stimulate writing and invention, to give some bonus to authors and inventors.

H.R. REP. No. 2222, 60th Cong., 2d Sess. (1909) at 5.

The Congress in drafting the 1976 Copyright Act noted the trend caused by these purposes:

> The history of copyright law has been one of gradual expansion in the types of works accorded protection, and the subject matter affected by this expansion has fallen into two general categories. In the first, scientific discoveries and technological developments have made possible new forms of creative expression that never existed before. In some of these cases the new expressive forms-- electronic music, filmstrips, and computer programs, for example-- could be regarded as an extension of copyrightable subject matter Congress had already intended to protect, and were thus considered copyrightable from the outset without the need of new

---

[5] H.R. 28192. H.R. REP. No. 2222, 60th Cong., 2d Sess. (1909).

> legislation. In other cases, such as photographs, sound recordings,
> and motion pictures, statutory enactment was deemed necessary to
> give them full recognition as copyrightable works.

*See* H.R. REP. 94-1476, 51, 1976 U.S.C.C.A.N. 5659, 5664. The Copyright Office, in altering

the Congress' legislation, is rewriting the law in direct contradiction, therefore, of not just the

constitutional mandate, but the Act as well.

c.       *The Supreme Court, Applying the Purpose of Copyright,*
*Has Expanded the Scope of Copyright, Reading the Act*
*Expansively, Not Regressively as the USCO Urges*

The Supreme Court has routinely resolved copyright cases consistently with the Act's

purpose. As early as 1884, the Supreme Court was presented with the lexical conundrum of

whether a photograph constituted a "writing" under the then-applicable copyright act, which

preceded the invention of photography. *See Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S.

53, 58 (1884) ("photography, as an art, was then unknown, and the scientific principle on which

it rests, and the chemicals and machinery by which it is operated, have all been discovered long

since that statute was enacted."). The Court thus determined that "[w]e entertain no doubt that

the constitution is broad enough to cover an act authorizing copyright of photographs, so far as

they are representatives of original intellectual conceptions of the author." *Id*. The Court further

explained what an author, an undefined term in the current Act, is, referring to an English

decision: "'author' involves originating, making, producing, as the inventive or master mind, the

thing which is to be protected, whether it be a drawing, or a painting, or a photograph," and

agreeing with the same, "[t]These views of the nature of authorship and of originality,

intellectual creation, and right to protection, confirm what we have already said." *Id*. at 61.

Likewise, in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975), the

Supreme Court made it clear that "[w]hen technological change has rendered its literal terms

ambiguous, the Copyright Act must be construed in light of its basic purpose." In *Aiken*, the issue

was whether playing a radio in a restaurant constituted a performance and thus an infringement.

13

The meaning of performance was therefore ambiguous given the technology invented after the 1909 Copyright Act. The Supreme Court held that playing a radio in a restaurant was not a "performance." *Id*., at 162. The Court held that a passive listener cannot be a performer, and "those who listen do not perform, and therefore do not infringe." *Id*., at 159 (citation omitted).

The Supreme Court has consistently relied on the principle that "our inquiry cannot be limited to ordinary meaning and legislative history, for this is a statute that was drafted long before the development of the electronic phenomena with which we deal here." *Fort. Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 395 (1968). Thus, "[w]e must read the statutory language of 60 years ago in the light of drastic technological change." *Id*. In doing so, the Supreme Court defined an airing over its airwaves as a "performance" of copyrighted work. *Id*. The Supreme Court reiterated that "[t]hese terms have not been construed in their narrow literal sense but, rather, with the reach necessary to reflect the broad scope of constitutional principles." *Goldstein*, 412 U.S. at 561.In the case of an AI-Generated Work, while an AI will not be motivated to generate additional works by the prospect of copyright or financial gain, individuals like Dr. Thaler, and businesses like music and movie studios, will be motivated to develop and use AI to generate new works, thereby achieving the purpose of the act. In addition, regardless of how a work is generated, the same incentives are needed to have legal persons disseminate both AI- and human-generated works.

Denying copyright to AI-created works would thus go against the well-worn principle that "[c]opyright protection extends to ***all*** 'original works of authorship fixed in any tangible medium' of expression." *Action Tapes, Inc. v. Mattson*, 462 F.3d 1010, 1013 (8th Cir. 2006) (emphasis added); *see also Bell Atl. Bus. Sys. Servs., Inc. v. Hitachi Data Sys. Corp.*, No. C 93–20079 JW, 1995 WL 836331, at *3 (N.D. Cal. Dec. 14, 1995) ("Copyright protection extends to ***all*** original works of authorship fixed in any tangible medium of expression") (emphasis added). This is especially when true when, as written, there are no limitations on who can be an author, and it essentially comes down to the uncontroversial principle that "[w]ritings are what authors create, but for one to be an author, the writing has to be original." 2 Patry § 3:20.

In sum, the history of the Supreme Court and Congress is replete with both bodies readings the Copyright Act to increase, not decrease, the scope of copyrightable material based on its purpose. The USCO's restrictive view defies its Congressional mandate, and the Supreme Court's interpretative canons for the Copyright Act and must not be given weight.

> d.      The USCO's Interpretation of the Act Is Not Entitled to Deference

This Court reviews an agency's constitutional and statutory interpretations and application, as well as conclusions of law, *de novo*, *i.e.*, without deference. *See Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). As an initial matter, the deference analysis is foreclosed by unambiguous language. *See Smith v. City of Jackson, Miss.*, 544 U.S. 228, 266 (2005) ("[I]t is elementary that 'no deference is due to agency interpretations at odds with the plain language of the statute itself.'") (Quoting *Pub. Emps. Ret. Sys. of Ohio v. Betts,* 492 U.S. 158, 171 (1989).)

Deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) is also not appropriate for Copyright Act decisions that are not based on its own formal rulemaking and regulatory authority. *See Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 25 (D.D.C. 2015) ("The Court will not apply Chevron deference in the absence of formal rulemaking. …")  Just like in *FilmOn X LLC*, the "Copyright Office's position . . . is not based on a formal regulation" and therefore not entitled to *Chevron* deference. *Fox Television Stations, Inc. v. FilmOn X LLC*, 150 F. Supp. 3d 1, 25 (D.D.C. 2015).

Defendants are not entitled to *Skidmore* deference either as described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which "is 'entitled to respect' only to the extent it has the 'power to persuade.'"  *Fox v. Clinton*, 684 F.3d 67, 76 (D.C. Cir. 2012) (quoting *Gonzales v. Oregon,* 546 U.S. 243, 256 (2006).) Thus, if the decision does not come from "reasoned decisionmaking" it is not entitled to any deference. *See id*. at 77. In this instance, relying on gilded age discussions of quasi-metaphysical creative sparks and dicta, in defiance of the agency's mandate to promote the dissemination and generation of works, is not reasoned decisionmaking.

15

In any event, "[e]ven if some level of deference were owed to the [agency's] interpretation . . . neither *Chevron* nor *Skidmore* permits a court to defer to an incorrect agency interpretation." *PhotoCure ASA v. Kappos*, 603 F. 3d 1372, 1376 (Fed. Cir. 2010). Here, the USCO's reasoning is not only unpersuasive—it is manifestly contrary to the purpose of the copyright system.

The USCO's explanation for its decision points haphazardly to a variety of inapt authorities that shed no light on the question of AI-Generated Works. The USCO begins by citing to *In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879) and to *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884) in support of its Human Authorship Requirement. *Compendium of U.S. Copyright Office Practices, Third Edition*, Section 306.

The appropriate takeaway from *Burrow-Giles*—which involved the Supreme Court holding for the first time that a photograph was eligible for copyright protection—is not that AI-Generated Works cannot be protected, but rather that our courts have a long history of purposive interpretation of the Act considering technological evolution. A photograph is, literally, not a writing, but the Supreme Court took a purposive approach by considering what definition would promote the goals of the Copyright Clause, rather than taking a hyper-literal approach that would have frustrated progress.

The related cases, *Mazer* and *Goldstein* relied on by USCO also actually support copyright registration for AI-Generated Works. While the USCO cites *Mazer* for the requirement of a "tangible expression of his ideas," to the extent this employs language referring to a personal pronoun, this actually describes the exact situation at hand, regarding the ideas formed by the AI. *Mazer v. Stein*, 347 U.S. at 214. As *Mazer* further explains, this distinguishes from a mere "reproduction," which the Work certainly is not. *See id*.

*Goldstein* also supports Plaintiff's argument. While USCO cites to the language that "author" in its constitutional sense, has been construed to mean an 'originator,' 'he to whom anything owes its origin.'" Instead, the point being made by the Court is clarified by further context, where it explains the expansiveness of how to interpret the Act, in that that "the word

'writings' might be limited to script or printed material, it may be interpreted to include any physical rendering of the fruits of creative intellectual or aesthetic labor." *Goldstein v. California*, 412 U.S. 546, 561 (1973). To the extent the USCO may not want to credit the AI with such capabilities, it is unquestionable it performed "aesthetic labor," creating something new. *See id.* This justifies full copyright protection, per *Mazer* and *Goldstein*.

USCO is also wrong to rely on a technical report written in 1979, when "CONTU did not attempt to determine whether a computer work generated with little or no human involvement is copyrightable" because it was "too speculative" to consider at the time.[6] Further contradicting USCO's conclusions, Arthur Miller, one of the CONTU commissioners, expressed confidence in the Harvard Law Review that, "[i]f the day arrives when a computer really is the sole author of an original artistic, musical, or literary work (whether novel or computer program), copyright law will be embracive and malleable enough to assimilate that development into the world of protected works." *Id.* at 1073. Professor Miller further opined:

> Our discomfort with the notion of computer-"authored" works (even if we cannot
> articulate a principled reason for the discomfort) is in keeping with a recurring
> phenomenon in the development of copyright law. In every age, a new technology
> has appeared about which people have expressed fear and concern, claiming that it
> defies the boundaries of the existing legal system. With respect to copyright, these
> claims were made about photographs, motion pictures, sound recordings, radio,
> television, and other telecommunications. In each case, the copyright system has
> managed over time to incorporate the new medium of expression into the existing

---

[6] Arthur R. Miller, Copyright Protection for Computer Programs, Databases, and Computer-Generated Works: Is Anything New Since Contu?, 106 Harv. L. Rev. 977, 1069-70 (1993)  With respect to whether AI-generated works would eventually be permitted under the Copyright Act, he states, "[i]t is far from clear that the federal courts ultimately will conclude that our copyright law requires human authorship, although that conclusion may have an emotional appeal to many. The Constitution's reference to 'authors' does not prevent the protection of computer-created works because that reference does not mandate that authors be flesh and blood. Textually, the Clause says little more than that 'Authors' are those responsible for creating the 'Writings' that Congress chooses to protect. Two centuries ago, that meant only maps, charts, and books, all of which at that time had only human authors. Today, of course, 'Writings' embraces an amazing spectrum of modes of expression completely unknown at that time, including computer programs, computer databases, sound recordings, motion pictures, photographs, and countless others. There is no reason why 'Authors' cannot undergo a comparable transformation. Certainly, the policies underlying copyright do not prevent it; if anything, these policies might well be inhibited by a human author requirement." *Id.* at 1065.

framework. Most recent of the upstart new technology has been assumed by computers. For a while the computers-and-copyright battlefield was centered on the copyrightability of computer programs as literary works. That contest now has been largely fought and resolved in favor of copyrightability. It may be that the next battle will be over copyrightability of computer-generated works.[7]

The USCO's discussion of CONTU and *In re Trade-Mark Cases*, taken together, show how the USCO is clearly incorrect on factual grounds it cannot challenge. The USCO also ignores the Supreme Court's principle that "our inquiry cannot be limited to ordinary meaning and legislative history, for this is a statute that was drafted long before the development of the electronic phenomena with which we deal here." *Fort. Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 395 (1968). Thus, "[w]e must read the statutory language of 60 years ago in the light of drastic technological change." *Id.* In doing so, the Supreme Court defined an airing over its airwaves as a "performance" of copyright work. *Id.* Like *Aiken*, the court looked at the actual relationship between performers and listeners, to essentially determine what was going on within the ambit of the Act. USCO additionally mentions a recent US Patent and Trademark Office ("USPTO") Report based on a public request for comment in which it claims that "the vast majority of commenters acknowledged that existing law does not permit a non-human to be an author [and] this should remain the law." Id. at 20–21. Respectfully, this statement by USPTO is not an accurate summary of either the submissions received as part of the request for comments, and it does not reflect a consensus of attitudes toward this matter. In any event, an appeal to a majority opinion of interested parties does not in any way indicate that opinion is correct or a proper legal analysis, and therefore should not form the basis for agency action.

---

[7] Arthur Miller, *Computers and Authorship: The Copyrightability of Computer-Generated Works,* WIPO WORLDWIDE SYMPOSIUM ON THE INTELLECTUAL PROPERTY ASPECTS OF ARTIFICIAL INTELLIGENCE (1991), https://www.wipo.int/edocs/pubdocs/en/wipo_pub_698.pdf. at 245-246. Arthur Miller went on to, describing photographic equipment that was less sophisticated than today's, noting that in a situation of accidental photography, which the USCO has never challenged, "[i]f the photograph is a copyrightable work of authorship, there is no apparent reason why the computer-generated work should be treated differently." *Id.* at 1072.

Finally, the USCO misreads two cases regarding animal-created works and works allegedly authored by spirits: *Naruto v. Slater*, 888 F.3d 418, 420 (9th Cir. 2018) and *Urantia Found. v. Kristen Maaherra*, 114 F.3d 955, 957-59 (9th Cir. 1997). In neither case did the Court choose to rule on the copyrightability of works owing their origin to non-humans despite it being at issue.

The *Naruto* case is not analogous because it involves animal art rather than AI-generated Works, and, in any event, it was decided based on standing. *Naruto v. Slater*, 888 F.3d 418, 420 (9th Cir. 2018) ("We must determine whether a monkey may sue humans, corporations, and companies for damages and injunctive relief arising from claims of copyright infringement. Our court's precedent requires us to conclude that the monkey's claim has standing under Article III of the United States Constitution. Nonetheless, we conclude that this monkey—and all animals, since they are not human—lacks statutory standing under the Copyright Act. We therefore affirm the judgment of the district court.") The present case, unlike *Naruto*, involves a human being suing for his own ownership rights in the Work.

*Urantia* involved a work allegedly authored in part by a spirit, which, respectfully, has no relevance to AI-Generated Works. *See Urantia Found. v. Kristen Maaherra*, 114 F.3d at 958. The 9th Circuit apparently even felt the need to clarify this, stating that, "[t]he copyright laws, of course, do not expressly require 'human' authorship, and considerable controversy has arisen in recent years over the copyrightability of [AI-Generated Works]." *Id*. at 958. Without addressing the protectability of AI-Generated Works, the 9th Circuit held that, "[a]t the very least, for a worldly entity to be guilty of infringing a copyright, that entity must have copied something created by another worldly entity." *Id*. at 958. The present case only involves original creation by worldly entities.

/ / /

/ / /

19

**B.     Dr. Thaler Is the Owner of the Copyright in the Work Either By Common Law Property Principles or, in the Alternative, Because as a Work For Hire Ownership Originally Vested in Him**

3.     Accession And The Right of First Possession Both Allow Dr. Thaler to Be an Owner By Operation of Law

As previously discussed, the USCO does not merit deference in its interpretation of whether an AI-created work can be copyrightable, and it likewise makes a plain legal error when it argues that even if the work were copyrightable, the Creativity Machine could not transfer the copyright to Dr. Thaler, because it fails to recognize two separate mechanisms that would make Dr. Thaler the original owner by operation of law given standard property principles.[8] As the Act explicitly states, copyrights do not need to be transferred by copyright, but can also transfer "by operation of law." *See* 17 U.S.C. § 204(a).

Such transfers by operation of law, include intestate succession (*Griffin v. Sheeran*, 351 F. Supp. 3d 492, 501 (S.D.N.Y. 2019)) and other similar automatic state-law processes. *See e.g. Fantasy, Inc. v. Fogerty*, 664 F. Supp. 1345, 1356 (N.D. Cal. 1987), *aff'd,* 984 F.2d 1524 (9th Cir. 1993), *rev'd, on other grounds* 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994) (Discussing how a copyright transfer made via "transfer of assets from a dissolving corporation to its shareholders is a transfer by operation of law."); *U.S. Home Corp. v. R.A. Kot Homes, Inc.*, 563 F.Supp.2d 971 (D.Minn. 2008) (Copyright transfer was automatic through merger under Minnesota law.); *see also Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 104 F.2d 306, 311 (2d Cir.), *cert. denied*, 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1939) (The Second Circuit allowed an infringement suit to proceed "since possession of the manuscript by the German publishers is evidence of [copyright] ownership, and the transfer in question is sufficient to convey a title good as against third persons"). In such instances, no written agreement is

---

[8] As can be seen in cases such as *Houghton Mifflin Co. v. Stackpole Sons, Inc.*, 104 F.2d 306., 311 (2d Cir.), the mere fact nobody claims property does not mean that such property does not exist.

necessary, as explicitly stated in the statute. Two transfers from the Creativity Machine to Dr. Thaler "by operation of law" apply in this circumstance: (1) the "fruit of the tree," and (2) the right of first possession.

        *a.*      *General Principles of Property Begetting Property Remaining with the Property Owner Provide the Copyright to Dr. Thaler*

Professor Thomas W. Merrill of Colombia Law School explains that accession should be viewed like a force, as it "operates like a magnet. Imagine that the contested object is like an iron pellet dropped on a table covered by various magnets; the pellet moves toward and becomes affixed to the magnet that exerts the strongest magnetic force on it, as determined by the size and power of the magnets as well as their physical proximity to the pellet. Similarly, prominent connection for purposes of accession is a function not merely of physical proximity but also other forces (mass, for example) that enter into our perception of what it means to say that something has a prominent connection to something else." Thomas W. Merrill, *Accession and Original Ownership*, 1 J. Legal Analysis 459, 463 (2009). There are numerous examples in the law of property acceding in ways that appear mundane and inherently reasonable. For instance, if Dr. Thaler owned a fruit tree, he would own the fruit from that tree. This does not require the tree to execute a written agreement to transfer the fruit, the fruit belongs to Dr. Thaler by virtue of his relationship to the tree. Similarly, if Dr. Thaler owned a cow that birthed a calf, "[t]he general rule, in the absence of an agreement to the contrary, is that the offspring or increase of tame or domestic animals belongs to the owner of the dam or mother." (*Carruth v. Easterling*, 150 So.2d 852 (Miss. 1963). This has been referred to as the "doctrine of increase." Thomas W. Merrill, *Accession and Original Ownership*, 1 J. Legal Analysis 459, 463 (2009).

Indeed, in a 6th Century case sometimes cited as the earliest example of copyright, King Diarmed of Ireland recognized this ancient rule of property and its relevance to intangible property in pronouncing that, "to every cow belongs her calf, therefore to every book belongs its

copy." *The Cathach / The Psalter of St Columba*, ROYAL IRISH ACADEMY (Aug. 31, 2015), www.ria.ie/cathach-psalter-st-columba (last visited Aug 7, 2022).

The same principle applies in the context of newly formed land caused by alluvial formations vesting in the riparian landowner. *See Nebraska v. Iowa*, 143 U.S. 359, 365–66 (1892). In addition, the Supreme Court has repeatedly upheld the same general principle ruling that interest follows the owner of the principal. *See Brown v. Legal Found. Of Washington,* 538 U.S. 216, 235 (2003)*; Philips v. Washington Legal Found,* 524 U.S. 156, 164-71 (1998)*; Webb's Fabulous Pharmacies v. Beckwith,* 449 U.S. 155, 162-64 (1980)).

Just like with all these examples, Dr. Thaler invented and owns the original property— the Creativity Machine. Its output, of all kinds, automatically vests in him. That is evident in the fact that if his AI had made a physical painting, he would own that tangible property. Just as interest is a concept, an intangible form of property like copyright also belongs in the owner of the underlying property "by process of law."

Another way to view the principle comes through accession to, for instance, improvements to property. "[T]he general rule is quite well settled that, where the articles later attached to an automobile or other principal article of personal property became so closely incorporated with the principal article that they cannot be identified and detached therefrom without injury to the automobile or principal article, such articles become part of the machine or principal article to which they are so attached and will pass by accession to one having a chattel mortgage or other lien upon the principal article, if the lien is enforced." *In re C Tek Software, Inc.*, 127 B.R. 501, 507–08 (Bankr. D.N.H. 1991). In this case, therefore, if copyright initially vests in an AI that cannot hold property, the owner of the AI would own any inseparable addition to his property.

> b.     *Dr. Thaler Has the Right of First Possession to the Copyright*

Alternately, another standard legal concept, and "one of the most basic premises of property law," is that "the first person to possess an object is its owner." João Marinotti,

22

*Possessing Intangibles*, 116 Nw. U. L. Rev. 1227, 1238 (2022). In Professor Marinotti's article on intangible property, he explains the way to understand first possession, and possession, is not through any physical means but "conceptualized as a means of information exchange rather than a physical fact." *Id*.

Dr. Thaler owns copyright in the Work by virtue of being the first party to possess it and communicate his ownership. "[T]he common and civil law (both of which accept the desirability of private ownership) have responded with the proposition that the taking possession of unowned things is the only possible way to acquire ownership of them." Richard A. Epstein, Possession as the Root of Title, 13 Georgia Law Review 1221, 1222 (1979). The rule of first possession is simple, but like accession, foundational to functioning systems of private property. If the AI made a piece of property, and if no other party was entitled to ownership by virtue of their relationship to the AI, then the Work was unowned property which Dr. Thaler took title to by virtue of first possession.

The law regarding discovered goods, has been consistently that the finder has a right "to any one, unless it be to the right owner, he shall be charged for them." *Coykendall v. Eaton*, 37 How. Pr. 438, 442 (N.Y. Gen. Term 1869). This has been enshrined in this country's earliest laws, becoming hornbook and taught in first-year law courses henceforth. *See e.g. Pierson v. Post*, 3 Cai. 175 (N.Y. Sup. Ct. 1805) (granting full property rights in a hunted fox to the farmer who ultimately claimed it, not the hunter who fruitlessly pursued it).

As previously cited, this principle has historically applied in copyright law without controversy for a party to claim copyright against any third-persons. In *Houghton Mifflin Co*. the Second Circuit explained this exact concept: "It is to be noted that, if an analogy is to be drawn between literary property and ordinary chattels .  . . since possession of the manuscript by the German publishers is evidence of ownership, [] the transfer in question is sufficient to convey a title good as against third persons, without any rights in the premises. That analogy has been asserted and relied on in [copyright] cases. We think it is sound and justifies the plaintiff's claim [of ownership as necessary for an infringement action]." *Houghton Mifflin Co. v. Stackpole Sons*,

104 F.2d 306, 311 (2d Cir. 1939) (citing copyright ownership cases where this analogy had previously been applied, *Callaghan v. Myers*, 128 U.S. 617, 658 (1888); *Gerlach-Barklow Co. v. Morris & Bendien*,23 F.2d 159, 161 (2d Cir. 1927)).

Likewise, Dr. Thaler possesses the machine, owns the machine, developed the machine, operated the machine, possesses the Work, and possesses every indica of ownership of the Work. In its possession he holds more than just the digital copy, but also the rights to the copyright embodied within it as well, certainly as to anyone who could bring a lawsuit to challenge him. As the USCO has noted, lacking legal personhood, the Machine lacks standing so Dr. Thaler having a title that is "good as to third persons" remains secure.

4.   Alternatively, the Work Is a Work-For-Hire and Dr. Thaler Its Author

Should the Court agree with the USCO that a copyright cannot vest in an AI, there is no need for it to do so under the since the Work can also qualify as a work for hire. 17 U.S.C. § 201 ("Copyright in a work protected under this title vests initially in the author or authors of the work . . . [i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author. . . .").[9] In other words, even though the AI created the Work, the property initially vests in the party who employed it, pursuant to the standard process set forth in the Act.

The only question under this theory is whether an AI can be an employee, and while it may not qualify as one under the labor code, it does not have to, and can be treated that way for the limited purpose of the work for hire doctrine without impacting the labor code. The Second Circuit previously explained that for purposes of copyright and purposes of the labor code, one

---

[9] To the extent the Copyright Office argues that qualifying as an author does not make the work copyrightable, all that is required is "originality" and that the original wok is a work of "authorship," so this clearly no bar to Stephen Thaler. *See 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright* § 2.01(A)(1) rev. ed.2022*)*. But for Dr. Thaler, the Work would not exist, it is original, and under the law, that means Dr. Thaler owns the copyright in the Work. Nonetheless, the Copyright Office is not quibbling about the correct author to name in the registration, but rather finding the Creative Machine's output is simply not copyrightable at all.

can be an employee under the USCO without being an employee under the NLRB. *See Horror, Inc. v. Miller*, 15 F.4th 232, 244-47 (2d Cir. 2021) Looking at the Copyright Act's plain language, an AI can be so employed.

Regarding the Work at bar, in his registration, Dr. Thaler, listed himself as the owner under a "work for hire," theory, and in his letters fully explained how the Work was created. The undisputed facts of how the Work was created story fits neatly within the plain language of what constitutes a work for hire under the Copyright Act. Dr. Stephen Thaler provided instructions and directed his AI to create the Work. The person for whom the Creativity Machine prepared the Work is unquestionably Dr. Thaler.

The USCO as part of its correspondence with Dr. Thaler could have informed him that he should list himself as the author of the Work. Instead, the USCO refused to register the copyright based on its theory that a work created by an AI is inherently uncopyrightable. US44. The USCO is, however, incorrect.

Starting with the plain language of the statute, an employee under the Copyright Act can be an AI, and thus the person "for whom the work was prepared," is the original author. *See* 17 U.S.C. § 201(b). While an AI system is not a legal person, and is not an employee in the sense of the labor code, in the context of the work for hire doctrine it acts as an employee. As discussed, *supra* Section IV.A.1, the first step is to read the language of the Act as standardly used, so one should look to the dictionary. *See Mohamad v. Palestinian Authority*, 566 U.S. 449, 456-57 (2012). As before, all the language in the Act remains agnostic as to the humanity of the creator in a work made for hire. As it makes clear, a work can be for hire done by an "employee" or if agreed to for an independent contractor creating a limited subset of copyrightable works. 17 U.S.C. § 101. Merriam-Webster's Dictionary provides the definition of employee as "one employed by another usually for wages or salary and in a position below the executive level." *Employee*, Merriam-Webster Dictionary (2023). The definition of employed here can mean, "to make use of (someone or something inactive)" or "to use or engage the services of," which can both apply to a machine. *See Employ*, Merriam-Webster Dictionary (2023). Likewise, "one" does

not denote a legal person either, as it is defined as "a single person or *thing*." *One*, Merriam-Webster Dictionary (2023) (Emphasis added.) What these definitions show is a disconnect between an "employee" and any requirement it be human in the context of work-for-hire.

The Supreme Court's interpretation of employee in the context of work-for-hire also has no human requirement. In *Community for Creative Non-Violence v. Reid*, the Supreme Court identified the factors that characterize an employment relationship under agency law. 490 U.S. 730 (1989) ("In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are [1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; [8] the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; [9] whether the hiring party is in business; [10] the provision of employee benefits; [11] and the tax treatment of the hired party.") On balance, these factors weigh heavily in favor of the Work being treated as a work for hire. *Id*. at 751-752. The Supreme Court, likewise, has also "reject[ed] the suggestion of respondent and amici that the § 101(1) term 'employee' refers only to formal, salaried employees." *Id.* fn. 8. In addition, later case law makes it clear that even if certain factors do not apply, as there was no payment for instance, this does not prevent finding of a work for hire. *Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992) (Explaining that the "factors should not merely be tallied but should be weighed according to their significance in the case.")

Taking the scenario as a whole, the AI is entirely controlled by Dr. Thaler, the AI only operates at Dr. Thaler's direction, and the AI is owned as property by Dr. Thaler. Ultimately, Dr. Thaler is unquestionably the "person for whom the work was prepared," (17 U.S.C. 101), and the Creativity Machine was, for all intents and purposes, within the broad conception of the Work for Hire Doctrine acting as an employee.

V.     **CONCLUSION**

Given the foregoing argument, the Copyright in the Work should be registered by the USCO.

Dated: January 10, 2023                    BROWN, NERI, SMITH & KHAN LLP


By:_____*/s/ Ryan Abbott*_____
         Ryan Abbott, Esq. (*pro hac vice* granted)
         Timothy Lamoureux, Esq. (*pro hac vice*
         application pending)

         Geoffrey A. Neri, Esq. VSB No. 72219
         11601 Wilshire Blvd, Ste. 2080
         Los Angeles, CA 90025
         Phone: (310) 593-9890
         Fax: (310) 593-9980
         Ryan@bnsklaw.com
         Tim@bnsklaw.com
         Geoff@bnsklaw.com

         Attorneys for Plaintiff