# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WASHINGTON D.C.

| | |
|---|---|
| Stephen Thaler, an individual<br><br>*Plaintiff,*<br><br>v.<br><br>Shira Perlmutter, in her official capacity as Register of Copyrights and Director of the United States Copyright Office; and The United States Copyright Office;<br><br>*Defendants.* | Case No. 1:22-cv-01564-BAH<br><br>**PLAINTIFF'S COMBINED OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................................... 1

II.    ARGUMENT ......................................................................................................... 2

     A.    The Copyright Act Has Always Allowed Nonhuman Authors, and This Should

           Apply Equally to Works Created by AI Systems ..................................................... 2

         1.    The Copyright Act Clearly Contemplates and Allows Non-Human

              Authorship................................................................................................. 2

         2.    The USCO Has No Support For Its View that Original Works of

              Authorship Require Humans...................................................................... 4

     B.    Dr. Thaler Is the Only Logical Owner of His AI's Creations................................ 7

     C.    The USCO Misconstrued Dr. Thaler's Common Law Argument, and Therefore

           Did Not Address It: Dr. Thaler Does Not Argue Common Law Created

           Copyright, Merely That Such Principles Entitle the Owner of an AI to Own

           Copyrights in Its Creations .................................................................................. 10

     D.    The Copyright Office Is Not Entitled to Deference.............................................. 11

     E.    By Ignoring the Purpose of the Act, the USCO Makes Clear Why Its Decision

           Was Arbitrary and Capricious .............................................................................. 13

III.    CONCLUSION.................................................................................................... 14

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska Airlines, Inc. v. Brock*, 480 U.S. 678 (1987)....................................................................12

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388 (D.D.C. 2015)...........15

*Burrow-Giles Lithographic Co. v. Sarony,* 111 U.S. 53 (1884) ...................................................10

*Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)...................................................14

*Esquire, Inc. v. Ringer,* 591 F.2d 796 (D.C. Cir. 1978)................................................................16

*Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469 (1992) ...................................................14

*Goldstein v. California*, 412 U.S. 546 (1973)...............................................................................10

*Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539 (1985)..................................................20

*In re Trade-Mark Cases*, 100 U.S. 82 (1879) ................................................................................9

*John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561 (D.C. Cir. 2007) .........................................14

*John Doe, Inc. v. Gonzalez*, No. CIV.A.06-966(CKK), 2006 WL 1805685 (D.D.C. June 29, 2006)..................................................................................................................................14

*Kelley v. Chicago Park Dist.*, 635 F.3d 290 (7th Cir. 2011) .......................................................11

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013)....................................................8

*Mazer v. Stein*, 347 U.S. 201 (1954)......................................................................................10, 19

*Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.,* 545 U.S. 967 (2005) ......19

*PhotoCure ASA v. Kappos*, 603 F. 3d 1372 (Fed. Cir. 2010) ......................................................18

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).............................19

*Urantia Found. v. Kristen Maaherra*, 114 F.3d at 958................................................................10

*Varsity Brands, Inc. v. Star Athletica, LLC,* 799 F.3d 468 (6th Cir. 2015) ................................17

*Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003) ......................................7, 8

**Statutes**

17 U.S.C. § 101 ................................................................................................................... 9

17 U.S.C. § 201 ................................................................................................................... 8

17 U.S.C. § 201(b) .............................................................................................................. 3

17 U.S.C. § 203 ................................................................................................................... 3

17 U.S.C. § 302(c) .............................................................................................................. 2

1909 Copyright Act ......................................................................................................... 2, 4

Copyright Act ...................................................................................... 1, 2, 3, 5, 13, 16

Copyright Act § 113(d)(3) .................................................................................................. 9

Copyright Act § 504(b) ...................................................................................................... 9

Copyright Act § 911(b) ...................................................................................................... 9

Copyright Act's Work Made For Hire Doctrine ................................................................. 2

Visual Artists Rights Act of 1990 ...................................................................................... 7

**Other Authorities**

*Copyright Protection for Computer Programs, Databases, and Computer-Generated Works:  Is*

   *anything new since CONTU?*, 106 HARV. L. REV 977, 1066 (1993) ................................... 17

H.R. REP. NO. 94-1476 ...................................................................................................... 9

## I.     __INTRODUCTION__

The United States Copyright Office ("USCO") has failed to support its central argument that the Copyright Act contains an implied human authorship requirement. Indeed, the Court need not look very far to see how unfounded that claim is—non-humans have been authors under the statute for more than a hundred years. The plain language of the Copyright Act ("Act") clearly allows non-human authors. Nor does anything in the Act exclude certain non-human authors, such as AI systems, from creating copyrighted works.

To the extent the Court finds the statute ambiguous in the case of an AI-generated work, this is perhaps *the* paradigmatic case of technological evolution requiring purposive statutory interpretation. Under a purposive approach, the Copyright Act clearly permits protection of AI-generated works, because contrary to what USCO argues, the Supreme Court has been crystal clear that the purpose of the statute is to benefit the American public by promoting the generation and dissemination of works. The Act's purpose is not to compensate human authors.

No case or other authority holds AI-generated works are inherently unprotectable, as the USCO urges. While dicta in various cases states that there is a need for human creativity, no one in these cases was considering artificial creativity, and no one could have reasonably foreseen the capabilities of modern AI. Even in dicta, the USCO points to no direct statement by the Supreme Court, the federal circuits, or even Commission on New Technological Uses of Copyrighted Works (CONTU), that an AI-generated work is not protectable under the Act.

Given that an AI-generated work can have copyright protection, in this case, the only possible owner of the work is Dr. Stephen Thaler ("Dr. Thaler"). Dr. Thaler is the AI's owner, programmer, and user. USCO now takes the position that because Dr. Thaler never stated on the record how he was involved in the creation of the work, that he cannot now argue that the work is

a work-made-for-hire. This is not accurate, as Dr. Thaler did, in his letters to the USCO, state both that he was claiming copyright including under the work made for hire (WMFH) doctrine, and also that he programmed the AI and was its user. Employees can have a different meaning under the Copyright Act's WMFH doctrine than under labor laws, and here the AI can qualify as an employer for this limited purpose because it meets almost all Supreme Court's criteria for these purposes, which is sufficient. The USCO also never contradicts standard legal principles of property transfers by law that entitled Dr. Thaler to the copyright at issue. It argues instead that these principles cannot create copyright, but that was never Dr. Thaler's argument.

II.    **ARGUMENT**

    A.    **The Copyright Act Has Always Allowed Nonhuman Authors, and This Should Apply Equally to Works Created by AI Systems**

        1.    **The Copyright Act Clearly Contemplates and Allows Non-Human Authorship**

The Copyright Act includes a clear regime for works created by authors with no natural lifespan, in other words, non-human authors. At set forth in 17 U.S. Code § 302(c), copyrights created by anonymous or pseudonymous authors last a set duration regardless of the date of death of the author.  Likewise, works made for hire have no set time based on lifetime. Non-humans have been authors under in U.S. Copyright since at least the 1909 Copyright Act.

The work for hire provision states, "the employer or other person for whom the work was prepared is considered the author for purposes of this title" in the case of a work for hire. 17 U.S.C. § 201(b). Even though it uses the phrase "other person," person here is used in its broadest sense to include non-human entities. *See Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1140–41 (9th Cir. 2003). The Act already treats human and non-human authors differently. For instance,

with regard to termination rights, it explicitly excludes "works for hire," creating a class of those authors, individual human creators, for whom there are additional rights and protections under the Act, and "works for hire" which include non-human authors, for which no such protection exists. 17 U.S.C. § 203. The bottom line is that nothing in the Act's language limits authorship to human beings, it instead fully contemplates non-human authors and already treats them differently, and numerous non-humans have been declared authors by the courts without controversy. See, e.g., *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 143 (2d Cir. 2013); *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d at 1140–41. Any distinctions the USCO attempts to draw lack support beyond conjecture. It is unambiguous that the Copyright Act envisions and allows for non-human authors.

To be clear, in cases in which, for example, a company registers copyright as an author, there is no requirement that any natural person be disclosed, or any requirement for any disclosure about how the work was created. As the USCO explains in its registration form for a work of visual art: "Author(s). After reading these instructions, decide who are the 'authors' of this work for copyright purposes… If you have checked 'Yes' to indicate that the work was 'made for hire,' you must give the full legal name of the employer (or other person for whom the work was prepared). You **may** also include the name of the employee along with the name of the employer (for example: 'Elster Publishing Co., employer for hire of John Ferguson')… For any part of this work that was 'made for hire,' check 'Yes' in the space provided, give the employer (or other person for whom the work was prepared) as 'Author' of that part, and <u>leave the space for dates of birth and death blank</u>." https://www.copyright.gov/forms/formva.pdf (emphasis added), last accessed February 25, 2023. It is entirely possible that the USCO has already registered numerous AI-generated works given that the USCO does not even contemplate disclosing the role of AI on its

registration form and has no meaningful way of detecting the use of AI in the creation of a work.

**2.      The USCO Has No Support For Its View that Original Works of Authorship Require Humans**

The USCO conflates "original work of authorship" and its Human Authorship Requirement without any basis or justification. Despite the USCO's argument that looks at the history of the prior version of the Act, there is no linkage between the 1909 Copyright Act language cited and the originality requirement. *See* Opp. at 13. Despite having no authority to support this position, USCO argues that it is Dr. Thaler who misinterprets the Act's language, while the USCO employs smoke and mirrors to attempt to obfuscate plain language.

The USCO effectively handwaves term limits not connected to the life of the author by looking solely at the anonymous and pseudonymous provisions, calling them "special provisions." Opp. 13 (citing H.R. REP. NO. 94-1476, at 137). This argues past the point. While these provisions may have historically involved natural persons, that is very different than there being a requirement for human authorship. The USCO ignores works for hire's disconnect from the life of the author given that it is often, and uncontroversially, *not human*. Thus, the USCO, by ignoring clear carve-outs for non-human creators, misconstrues the plain language of the Copyright Act.

The Supreme Court precedent the USCO relies on does not change the plain language of the Act or otherwise support the USCO's argument that AI cannot be an author. The common issue is that there is a general assumption that "intellectual" labor is something a human does, but none of these cases address non-human creativity or AI-based creativity in ways that help the USCO. The USCO cites *Trade-Mark Cases* discussing "fruits of intellectual labor," but artificial *intelligence* by its nature, and according to Dr. Thaler's application, performs intellectual labor. *See In re Trade-Mark Cases*, 100 U.S. 82, 94 (1879); US0026. As such, this case supports Dr.

Thaler's position, or at least it fails to support USCO's position.

Likewise, the USCO misrelies on *Sarony*. There is nothing inherently human about the concept of choice, and certainly not legally in any way the USCO has articulated through authority. On its face, the "intellectual conception" that *Sarony* requires was done by the AI in this case. *See Burrow-Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 59 (1884).

Likewise, there is nothing inherently human about an "idea." Essentially, the USCO has begun with a factual assumption that it is not legally in the position to take to justify a claim that every requirement is inherently human. But the cases relied on by the USCO like *Mazer v. Stein* never identifies that a tangible idea must come from a human. *See Mazer v. Stein*, 347 U.S. 201, 214 (1954) ("They must be original, that is, the author's tangible expression of his ideas.") Likewise, there is nothing about the language regarding an "originator" required by Court that is inherently human, as the Work in this case likewise owns its origin to artificial intelligence. *See Goldstein v. California*, 412 U.S. 546, 561 (1973) ("While an 'author' may be viewed as an individual who writes an original composition, the term in its constitutional sense, has been construed to mean an 'originator,' 'he to whom anything owes its origin.'").

As Plaintiff already briefed, *Urantia* and *Naruto* do not support USCO's arguments. *Urantia* involved alleged divinity in creation, but as noted in the Brief, the AI exists in the physical world. *Compare Urantia Found. v. Kristen Maaherra*, 114 F.3d at 958 ("[a]t the very least, for a worldly entity to be guilty of infringing a copyright, that entity must have copied something created by another worldly entity."). It is surprising the USCO would attempt to rely on this case for support, given the 9th Circuit even went out of its way to clarify that its holding did not apply to AI-generated works, referring to the instant controversy without resolving it, "[t]he copyright laws, of course, do not expressly require 'human' authorship, and considerable controversy has arisen

in recent years over the copyrightability of [AI-Generated Works]." *Id*. at 958.

Likewise, in its Opposition, the USCO admits *Naruto* was an animal standing case. The USCO writes that "'Animals other than humans' cannot sue under the Act." Opp. at 17. The USCO further writes that "'[I]f Congress and the President intended to take the extraordinary step of authorizing animals' to sue, the statute would need to state so clearly." Opp. at 17. This language all relates to *standing*, not the ownership of a copyright, which is the question presented here. For the avoidance of doubt, Dr. Thaler is suing on his own behalf, whereas his AI is not a party to this case and is not attempting to sue or otherwise claim any right. Dr. Thaler, undisputedly a human being, owns the copyright at issue, and is seeking this Court's holding in support of that right.

The USCO's reliance *Kelley* suffers from a similar flaw. *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 304 (7th Cir. 2011). *Kelley* involved moral rights claim under the Visual Artists Rights Act of 1990, which is not at issue in this case. *Id*. at 300. In turn, the moral rights claim depended on there being copyright in a *garden*. *Id*. This failed based on authorship and fixation, as without fixation there cannot be a protectable writing.

While the Kelley court stated that authors are human, this was in the context of holding that authorship cannot depend on forces of nature. "[W]orks owing their form to the forces of nature cannot be copyrighted." *Id*. at 305. The garden "originate[s] in nature, and natural forces— not the intellect of the gardener…" Owing a form to nature means there was no "intelligence" involved. *Id*. What the Court must contend with is that the AI in the present case does have intelligence, it is just artificial.

None of *Urantia*, *Naruto*, or *Kelley* involved AI-generated works, and the present work is not one owing its origin to divine forces, nature, or monkeys. Even in dicta, none of these cases do the work that USCO is looking for.

"Congress' silence is just that—silence." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). The bottom line is that authorship has an extremely broad definition, with no restriction on AI authorship. There is a long history of non-human authors in copyright jurisprudence. The USCO must strain the language and rely on inapt case law and proclamations regarding human authorship that are far removed from this plain language, and it amounts to ignoring the statute's own plain language.

**B.      Dr. Thaler Is the Only Logical Owner of His AI's Creations**

Just as authors are often not human, as with corporations, copyrights commonly vest in employers by virtue of the "work for hire" provision the Act. 17 U.S.C. § 201 ("Copyright in a work protected under this title vests initially in the author or authors of the work . . . [i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author. . . .") The USCO takes umbrage at the concept of an AI-as-employee, because of several assumed issues, none of which are applicable in this case. USCO challenges the designation of the work made for hire in the report, it challenges the claim that a machine/tool can be an employee under the WMFH doctrine, and it argues the level of control levied by Dr. Thaler is not part of the record and therefore not at issue. Each one of these arguments misses the mark.

The work was listed as a "work for hire," in which case the "author" for statutory purposes is Dr. Thaler. *See* US0002. Thus, if the issue is simply that the machine cannot legally be the "author," then the Work is a WMFH.[1] The AI, in the sense that it is anything, is an autonomous

_____

[1] The USCO notes that the idea that an AI can be an employee would have broad implications is inaccurate and ignores Dr. Thaler's analysis of the Act-specific interpretation that has already been applied to the Copyright Act regarding employees that does *not* apply outside of that context. *See Horror, Inc. v. Miller*, 15 F.4th 232, 244-47 (2d Cir. 2021). Thus, this attempt to conjure a parade of horribles hits a dead end immediately as it ignores clear precedent.

actor operating under the direction of its programmer and user. The USCO ignores the autonomy of AI when constructing its counterarguments.

For instance, the USCO argues, in part, that an AI cannot be an employee for copyright purposes, because that could include pencils, but the comparison is absurd. A pencil does not functionally automate tasks and make creative decisions. The AI-as-employee, unlike a "pencil," is autonomous, and performs in functionally the same manner as a human employee in this limited context. It completes a task on behalf of its employer, and the result is that the employer simply owns the work. USCO overcomplicates the scenario using *non sequitur*.

The USCO's arguments as to pronouns in the statute indicating that a work for hire cannot be performed by an AI is also without support. The USCO argues that the personal "his" and "her" that refer to employee in 17 U.S.C. 101 forecloses an AI, but they ignore the numerous places "his or her" or some variant on the pronouns, are used in the Act to refer to both humans *and* non-humans. For instance, in Section 504(b) of the Act Congress wrote, "The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement…" Now, the USCO is certainly not going to challenge that a copyright owner does not have to be human or claim that only humans can sue for infringement. Likewise, infringers, are also "required to prove his or her deductible…." *Id*. The same language is used in Section 911(b). The USCO will likewise not argue that only human beings can be infringers, yet the pronouns are used inclusively. In addition, Section 113(d)(3) of the Act refers to a "system of records whereby any author of a work of visual art . . . may record his or her identity and address with the Copyright Office…" Once again, authors including nonhumans is noncontroversial, and once again the Act uses "his or her" inclusively to nonhumans.

The USCO provides no rationale whatsoever to explain why the Act uses "his or her"

throughout to refer to entities that even the USCO would agree are nonhuman, and yet only in the "work for hire" definition it should mean a human where the Act was clearly not drafted with any such limitation in mind. The correct thing to do is follow the canon of construction that identical language is used the same way throughout the Act, which means it refers to humans and nonhumans alike. *See John Doe, Inc. v. Gonzalez*, No. CIV.A.06-966(CKK), 2006 WL 1805685, at *20 (D.D.C. June 29, 2006), *aff'd sub nom. John Doe, Inc. v. Drug Enf't Admin.*, 484 F.3d 561 (D.C. Cir. 2007) (citing *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 478 (1992)).

As it stands in common usage as well, pronouns can often refer to non-persons. Many natural persons do not identify with gendered pronouns, gendered pronouns are used to refer to non-human animals, and gendered pronouns are popularly used to refer to AI systems such as Siri or Alexa. Ordinary meanings also change over time—a "computer" once referred to a natural person making computations.

Applying the *CCNV* factors also supports treating the AI-generated work as a WMFH. While the USCO argues that the AI cannot meet all the factors, the Supreme Court already made it explicitly clear that not all employment factors are necessary to establish employment, as its own analysis weighed some factors for and some against independent contractor status. *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 752 (1989). Thus, the fact that not all factors apply does not prevent the finding of employment for purposes of the WMFH doctrine.

Finally, the USCO gets it backward regarding supplementing the record. Its decision must be justified based on the record as it stands. The record must be taken as true at this stage, as by inventing new factual reasons to deny registration that are not in the record, the Court cannot find "as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393

(D.D.C. 2015) (internal quotation marks and citations omitted). If such a fact would preclude registration, it is not on the record. What is on record is Dr. Thaler's statement that he programmed and used the machine, and that it created the Work at issue as a work made for hire. US0002; US0024.

Dr. Thaler is not attempting to supplement the record. Control and ownership are clear on the face of the application and the letters to the USCO stating that Dr. Thaler owned, programmed, and used the AI. US0026 ("In the present case, the current applicant, Stephen Thaler, is the owner of the AI that generated the CGW and should thus be the owner of any copyright. Stephen Thaler was also the AI's user and programmer.") To the extent the USCO attempts to recast this argument to be that Dr. Thaler directed the AI in the same manner as one would use simple editing software, that is not the argument. The AI created the artwork autonomously, but in terms of ownership, and control of the AI itself, Dr. Thaler is the "user" and "programmer" who directed the AI to make the Work, which is in a manner entirely analogous to a work for hire. A very high level of control is clear on the record, as Dr. Thaler programmed and invented the AI, so the USCO's argument that there is inadequate direction for it to be an employee is contrafactual, and Dr. Thaler's explanation cannot be challenged given the procedural posture of this case.

C.    **The USCO Misconstrued Dr. Thaler's Common Law Argument, and Therefore Did Not Address It: Dr. Thaler Does Not Argue Common Law Created Copyright, Merely That Such Principles Entitle the Owner of an AI to Own Copyrights in Its Creations**

The USCO appears to have misconstrued the common law argument. It is not designed to explain that the copyright exists in the first instance, but what law operates to make Dr. Thaler its owner. The issue presented has essentially two parts. First, has a copyright been created that exists

10

in the Work? Second, how does Dr. Thaler own it? The common law transfer issue addresses this second question.

When copyright comes into being, since an AI can be the creator under the plain language of the Act, the copyright exists, and if the Court rejects work for hire, it is owned by Dr. Thaler due to standard property principles. This was fully briefed in the opening brief. Plaintiff Opening Brief at 20-24. As no discussion of transfer by operation of law through operational of law as to copyrights that exist was briefed by the USCO, they have waived any such argument.

### D.   The Copyright Office Is Not Entitled to Deference

The Copyright Office also overstates the amount of weight its opinion should be granted. First, the USCO fails to show it should be given deference at all under the APA, as it is not empowered to interpret the Copyright Act itself. The USCO's authority showing support comes from cases interpreting its own regulations, not the Act itself. To support its argument that its interpretation should have "considerable weight," the USCO cites a case where the USCO was interpreting its own regulations. *See Esquire, Inc. v. Ringer,* 591 F.2d 796, 801 (D.C. Cir. 1978). The full quote, which the USCO did not include, is that "Considerable weight is to be given to an agency's interpretation of its regulations." *Id*. The USCO was interpreting its own regulation regarding the copyrightability of utilitarian designs for which was an "issue of long-standing concern and is clearly a matter in the Register has considerable expertise." *Id*. Likewise, another functional art case was selected by the USCO to make the same point, because this is one area the USCO does have experience, has drafted regulations, and has clearly developed a longstanding expertise. *See Varsity Brands, Inc. v. Star Athletica, LLC,* 799 F.3d 468, 480 (6th Cir. 2015) ("the Copyright Office's expertise in identifying and thinking about the difference between art and function surpasses ours"), *aff'd on other grounds* 580 U.S. 405 (2017). In this case, however, the

USCO has in its own briefing disavowed knowledge as to how the AI functions, so espousing expertise on registration of such works, defies logic, and its reasoning is entitled to no deference.

In the case at bar, the USCO's analysis amounts to a surface-level proclamation that does not merit deference. The USCO has not provided evidence it considered question the issue of AI authorship meaningfully in the past, so the USCO's argument is inapt, without any authority supporting its conclusions. As noted in Dr. Thaler's Opening Brief, Miller specifically chose not to speak on it except to say that it would likely be allowed. Arthur Miller, *Copyright Protection for Computer Programs, Databases, and Computer-Generated Works:  Is anything new since CONTU?*, 106 HARV. L. REV 977, 1066 (1993) (Calling AI-generated works "too speculative" to discuss further in CONTU's analysis.)[2]

In addition, Dr. Thaler does not argue that disagreement makes the USCO's decision arbitrary and capricious (Opp. at 12); this is the USCO's strawman. The fact that the USCO has no support for its argument makes the decision not to register the Work arbitrary and capricious. The Copyright Office begins its brief by challenging the factual underpinnings of Dr. Thaler's brief, but in doing so, has revealed that it is looking at facts beyond the non-human identity of the AI. The USCO, in a footnote, states that it did not consider whether the "originality" requirement was met. Opp. at 6, fn. 1. However, it does not investigate this factor as part of its ordinary review of other applications for registration. Nonetheless, for the purpose of the Opposition, in doing so, the USCO admits that with more information it could determine that the work *was* original, so it posits that an AI could create an objectively original work.

---

[2] CONTU was the Commission on New Technological Uses of Copyrighted Works, was created to study issues associated with copyrighted works in computers and computer-related works in the late 1970s. *See Final Report of the National Commission on New Technological Uses of Copyrighted Works. digital-law-online.info, University of Utah. National Commission on New Technological Uses of Copyrighted Works. July 31, 1978. Retrieved February 23, 2023.*

The appeal to the Compendium is also circular reasoning. Just because the USCO has previously stated an erroneous stance in its Compendium does not mean it should have greater deference. On its face, the Compendium's reliance on only two cases from the 19th Century for the proposition that AI-generated works are unprotectable, cases from far before the concept of AI authorship was conceivable, means the Compendium is woefully relying on inapt case law and dicta that necessarily has no bearing on the question at bar. While USCO's brief inaccurately claims that: "Plaintiff relies heavily on a proclamation from the King of Ireland in the 6th Century and state court cases establishing physical property principles." (Opp. at 20). In fact, Plaintiff's Brief only once mentioned the proclamation to explain that the basic property principles in question governing ownership are ancient. By contrast, the Compendium only relies on cases from the same Century that Luddism was in fashion to govern its approach to frontier technologies.

Finally, the USCO never argues that it is afforded any deference when rendering an interpretation that defies the plain language of the statute it is interpreting. *See PhotoCure ASA v. Kappos*, 603 F. 3d 1372, 1376 (Fed. Cir. 2010). As such, no deference should be afforded the USCO's interpretation.

### E.    By Ignoring the Purpose of the Act, the USCO Makes Clear Why Its Decision Was Arbitrary and Capricious

It is well-settled law that purpose should be considered if a statute is ambiguous. *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021) (quoting *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 430 (1984).) The Supreme Court made it clear that when there are changes in technology creating ambiguity, the "principles" of the Act must be followed. *Id*. Although the USCO has disavowed any argument that the Copyright Act is ambiguous, eliminating room for any deference. *See Nat'l Cable & Telecommunications Ass'n v. Brand X*

*Internet Servs.,* 545 U.S. 967, 982, (2005) (When a court's "construction follows from the unambiguous terms of the statute . . . [it] leaves no room for agency discretion.") Disavowing the purpose and principle of the Act entirely, as the USCO does in its opposition, supports a finding that the considerations of the USCO lack a rational basis, rendering it arbitrary and capricious, as it ignores the clear mandate from the Supreme Court.

After ignoring the importance of the statutory purpose, the USCO goes on to argue in the alternative and simply misstates the purpose of the Copyright Act. The purpose is not to "incentivize humans," as that is merely the tool by which the purpose is obtained, which was clearly explained by the Supreme Court. *Twentieth Century Music Corp.,* 422 U.S. at 156 ("The immediate effect of our copyright law is to secure a fair return for an author's creative labor. But the ultimate aim is, by this incentive, to stimulate artistic creativity for the general public good."); *Mazer v. Stein*, 347 U.S. 201, 219 (1953) ("the economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and the useful arts.'")

Likewise, the USCO ignores how copyright's ultimate aim is served by AI, by handwaving it as something that requires no incentive, but this makes the same fundamental mistake the USCO has made throughout. The recipient of the incentive is Dr. Thaler. Dr. Thaler, and others, do require incentives to build and use AI to create and disseminate works, due to lacking the "economic inventive to create and disseminate ideas." *See Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 558 (1985).

III.   **CONCLUSION**

For the foregoing reasons, Dr. Thaler asks that the USCO's decision not to register the

copyright in the Work be reversed, and for the determination that a work created by an AI can be copyrightable.

Dated: March 7, 2023                                  BROWN, NERI, SMITH & KHAN LLP


By: _____/s/ Ryan Abbott_____
      Ryan Abbott, Esq. (*pro hac vice* granted)
      Timothy Lamoureux, Esq. (*pro hac vice*
      application pending)

      Geoffrey A. Neri, Esq. VSB No. 72219
      11601 Wilshire Blvd, Ste. 2080
      Los Angeles, CA 90025
      Phone: (310) 593-9890
      Fax: (310) 593-9980
      Ryan@bnsklaw.com
      Geoff@bnsklaw.com

      *Attorneys for Plaintiff-Appellant*